772 A.2d 34 (2001)
339 N.J. Super. 412
James W. JONES and Margie Jones, his wife, Plaintiffs-Appellants,
v.
ALUMINUM SHAPES, INC. & Frank Wimmersberger, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted March 5, 2001.
Decided April 23, 2001.
*36 S. Robert Freidel, Jr., Turnersville, for appellants.
Stevens & Lee, Cherry Hill, for respondents (Paul R. Lewis, Saddle River, of counsel; Michael J. Fagan on the brief).
Before Judges BRAITHWAITE, WELLS and LANDAU.
*35 The opinion of the Court was delivered by WELLS, J.A.D.
Plaintiffs, James and Margie Jones, appeal from the grant of a motion for summary judgment which dismissed Law Against Discrimination (LAD) claims brought following James Jones' termination from employment at Aluminum Shapes, Inc. In the same order the motion judge also dismissed the complaint as to the individual defendant Frank Wimmersberger, the Human Resources Director of Aluminum Shapes and the claims of intentional infliction of emotional distress.[1]
We recite the facts from the deposition testimony and certifications presented to the motion judge which are most favorable to the Joneses. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). James Jones was employed by defendant employer Aluminum Shapes without incident from 1966 to 1990. He worked in Aluminum Shapes' products fabrication plant as a crane operator, a union position covered under the employer's collective bargaining agreement with the Industrial Workers Union, Local No. 837, a Teamsters affiliate.
In 1990, Jones was injured on the job, when a steel band snapped, somehow got under Jones' safety glasses, and almost completely removed his right eye. When the accident occurred, Jones was immediately sent to a local hospital, and then *37 transferred to Wills Eye Hospital in Philadelphia, where he underwent several surgeries over a five-day period, in an attempt to save the sight in his right eye.
Jones did not fully recover from the accident. According to a neuropsychiatrist's 1991 evaluation, made over a year after the accident, he was still in continual distress because of the condition of his right eye. Physiologically, the eye itself was in rather terrible shape. It constantly teared, especially in the presence of fumes, dust or pollution. Jones was photophobic and could no longer drive. Jones' vision in the injured eye was almost nonexistent, and he also suffered from cosmetic defects of his eyelid.
According to the examiner, Jones also experienced post-traumatic stress disorder as a result of the injury, displaying tension and anxiety, as well as phobias of bright light, pollution, and crowds, who he feared would stare at his disfigurement.
Jones presently reports ongoing psychological difficulties as a result of the injury, including lack of sexual interest and difficulty sleeping.
Between 1990 and 1993, Jones could not work as a result of the injury and its attendant pain, and was supported through workers' compensation. In that time period, he underwent several largely unsuccessful surgeries in an attempt to regain his sight.
By March 1993, Jones felt that he was ready to return to work. In April, Jones' doctor, Dr. Altman, sent a letter to Aluminum Shapes' insurance company, asserting that Jones no longer had binocular vision, and therefore was not qualified for the position of crane operator. Dr. Altman did, however, approve a modified job description offered by Aluminum Shapes, in which Jones would work in the quality control department, a more sedentary clerical position. Jones could not immediately return to work after being approved for the clerical position, due to another operation on the affected eye.
By the fall of 1993, when Jones had recovered from surgery and could return to work, Wimmersberger informed him that the quality control job no longer existed, and instead offered Jones a position as a machine operator in the plant's fabrication department, with Jones' preference of shift. According to Jones' deposition testimony, Wimmersberger also discussed with the Jones the possibility of a job in shipping/packing. (Wimmersberger testified in his deposition that he may have also discussed with Jones a position in the extruding department).
Jones testified that he was unhappy with these alternatives. He did not wish to have a job in shipping/packing because of the lifting requirements. He also was afraid to take the machine operator position because he felt it was too dangerous for a person with his limited vision. According to Jones, "I didn't want to run that punch press. As I stated before, I seen people with 20-20 vision lose their fingers. I've took [sic] them to the hospital." Jones suggested to Wimmersberger that he be permitted to return to a crane job, either as an operator or a helper. However, Jones testified that he was informed that he could not go back to a crane job because of safety regulations.
Eventually, plant management agreed to make a special job for Jones in the quality control department, where Jones began working in January 1994.
Jones' new job originally entailed traveling around the plant collecting product samples for quality control testing, and then notching each sample with a router. However, after Jones submitted a doctor's report, he was no longer required to use the router. Jones was still paid his higher *38 crane operator's salary, and retained his union membership and benefits while he held this job.
Jones testified that he understood that employees with union jobs were often placed in the quality control department when they were injured, until they were sufficiently recovered to return to their union jobs.
From January 1994 until late 1995, Jones worked uneventfully in the quality control position. In 1995, a human resources employee spoke to Jones about the possibility of returning to a regular union job. Once again, Aluminum Shapes offered Jones positions in either shipping/packing or in the fabrication department.
Jones approached Wimmersberger about the situation, informing him that he did not wish to perform either job, because he did not want a job involving bending or lifting, nor did he feel safe operating a punch press in the fabrication department. According to Jones, Wimmersberger asked for a doctor's report verifying that Jones was unable to perform in either position. In December 1995, Jones produced a letter from his eye doctor, Dr. Naidoff, verifying that Jones should not be around machine tools because his vision was too poor to operate such machines safely. The letter also noted that bending or heavy lifting put a strain on Jones' eye. Once the doctor's report was received, Jones was allowed to remain in the quality control position for another year.
In early October 1996, Jones was transferred out of quality control, and back to a regular union job in the extrusion department in the position known as "tail stretcher."[2] Aluminum Shapes' stated reason for the transfer, articulated through a letter written by Wimmersberger, was that the plant was experiencing a downsizing, and for that reason, "it was necessary to move Mr. Jones back into a union job. We made this selection based on the company's needs and with Mr. Jones' physical limitations in mind." The letter noted that Jones had been given time to consult with his physician and attorney before reporting, and also noted that the transfer would not affect Jones' pay rate or shift.
Jones approached Wimmersberger regarding his objections to the impending transfer. Jones felt that, as a tail stretcher, he would still be too close to dangerous machinery and fumes, despite the fact that the job did not require him to actually operate dangerous machinery.
According to Jones, Wimmersberger mentioned the plant downsizing, and asserted that the extrusion department job was the only one available for him. He suggested that Jones discuss the matter with his own lawyer if he objected to the transfer. Jones also asserts that, around this time, Wimmersberger stated to him that "[T]he free ride is over."
According to Jones' testimony, at this point Wimmersberger also suggested that, if Jones could think of any job that he actually could do, even if it required accommodation, that Aluminum Shapes would "see what they could do." Jones admitted that he never suggested any such job.
Later that month, on October 23, 1996, Wimmersberger again met with Jones and offered, as a compromise, to leave him in the quality control department. When Jones pointed out that, due to his accident, *39 he had sleeping problems, Wimmersberger agreed to allow him to remain on the same later shift on which he had been working, instead of requiring that he report earlier. Jones agreed to the idea. Then, according to Jones, Wimmersberger and another supervisor left the room. Wimmersberger returned shortly thereafter, and stated that, in order to remain in quality control, Jones would have to take the job as a nonunion position, thus forfeiting his union benefits. Wimmersberger testified that the reason for keeping the position nonunion was not financial; rather, the management felt that the position, which entailed acting as a "watchdog" over union members, would probably best be filled by someone not affiliated with the union. Additionally, Wimmersberger stated that management simply did not want to expand the bargaining unit further. Jones offered no evidence at all that this reason was in any way pretextual.
Jones absolutely refused to take a nonunion job. Stated plaintiff, "I said no, I'm not going to do that. And I described why, and the benefits I would be losing, as I stated before, my insurance, my dental, my raises that I'm getting every year due to the contract, and things like that, my insurance." Jones did admit, however, that he still retains medical insurance through his wife's policy, but contends that the coverage is more expensive and less comprehensive.
When Jones was asked during his deposition if there had been any union jobs at the plant that he could have physically performed, he responded that there was only one; a job as a driver, which was already filled.
We initially review the principles of law which must be applied to the stated facts. LAD prohibits discrimination against individuals on the basis of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, nationality or handicap. N.J.S.A. 10:5-3, 10:5-4.1. LAD defines "handicapped" as specifically including visual impairments. N.J.S.A. 10:5-5(q).
With specific regard to the issue of employment discrimination against the disabled, N.J.S.A. 10:5-4.1 prohibits "any unlawful discrimination against any person because such person is or has been at any time handicapped or any unlawful employment practice against such person, unless the nature and extent of the handicap reasonably precludes the performance of the particular employment."
The New Jersey Administrative Code (Code)further defines the role of an employer in ensuring that a disabled person is disadvantaged in the workplace as little as possible. This responsibility on the part of the employer is known as the responsibility of "reasonable accommodation." N.J.A.C. 13:13-2.5 states,
(a) All employers shall conduct their employment procedures in such a manner as to assure that all people with disabilities are given equal consideration with people who do not have disabilities for all aspects of employment including, but not limited to, hiring, promotion, tenure, training, assignment, transfers, and leaves on the basis of their qualifications and abilities. Each individual's ability to perform a particular job must be assessed on an individual basis.
(b) An employer must make a reasonable accommodation to the limitations of an employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business. The determination as to whether an employer has failed to make reasonable accommodation *40 will be made on a case-by-case basis.
1. Under circumstances where such accommodation will not impose an undue hardship on the operation of an employer's business, examples of reasonable accommodation may include:
i. Making facilities used by employees readily accessible and usable by people with disabilities;
ii. Job restructuring, part-time or modified work schedules;
iii. Acquisition or modification of equipment or devices; and
iv. Job reassignment and other similar actions.
2. An employer shall consider the possibility of reasonable accommodation before firing, demoting or refusing to hire or promote a person with a disability on the grounds that his or her disability precludes job performance.
3. In determining whether an accommodation would impose undue hardship on the operation of an employer's business, factors to be considered include:
i. The overall size of the employer's business with respect to the number of employees, number and type of facilities, and size of budget;
ii. The type of the employer's operations, including the composition and structure of the employer's workforce;
iii. The nature and cost of the accommodation needed; and
iv. The extent to which accommodation would involve waiver of an essential requirement of a job as opposed to a tangential or non-business necessity requirement.
It is well-settled law in New Jersey that our state courts, in interpreting LAD, should look to federal anti-discrimination cases "as a key source of interpretive authority." Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990).
Applying these principles and federal precedent, the motion judge recognized that a "reasonable accommodation" for the disabled employee requires a so-called "interactive process," in which both employer and employee bear responsibility for communicating with one another to "identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations." Smith v. Midland Brake, 180 F.3d 1154, 1171 (10th Cir.1999), quoting 29 C.F.R. § 1630.2(o)(3). The judge quoted Midland Brake, noting that, "In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job."
The motion judge found as a matter of law that no issue of fact existed with regard to whether defendants had violated the LAD by failing to engage in this mandatory "interactive process" with Jones in order to arrive at a reasonable accommodation. According to the motion judge, "The factual situation ... indicates that there was the interaction to the extent that was necessary for the company to [make reasonable accommodation]."
Jones raises the following points on appeal:
I. THE TRIAL COURT BELOW ERRED IN THAT IT ACCEPTED DEFENDANTS' VERSION OF EVENTS EVEN THOUGH PLAINTIFFS INTRODUCED EVIDENCE THAT CONTRADICTED DEFENDANTS' VIEW OF EVENTS AS TO DEFENDANTS' PARTICIPATION IN *41 THE "INTERACTIVE PROCESS" REQUIRED BY LAW.
II. PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED.
III. THE COURT BELOW ERRED WHEN IT FAILED TO CONSIDER THAT THE DEFENDANTS HAD NO EVIDENCE TO SHOW IT WOULD SUFFER AN UNDUE HARDSHIP IF PLAINTIFF REMAINED A UNION MEMBER.
We affirm for substantially the reasons offered by the motion judge. We nevertheless address some of Jones' arguments.
The Joneses contend that the trial court erred in following Midland Brake while ignoring Taylor v. Phoenixville School District, 184 F.3d 296 (3d Cir.1999). In Taylor, the Third Circuit noted that the "interactive process" of arriving at reasonable accommodation for a disabled employee must involve pro-active participation on the part of the employer. According to Taylor,
The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome. That's not the pro-active process intended: it does not help avoid litigation by bringing the parties to a negotiated settlement and it unfairly exploits the employee's comparative lack of information about what accommodation the employer might allow.
....
To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.
[Id. at 315-316, 319-320.]
Jones' main contention is that Aluminum Shapes did not engage in the interactive process in good faith, as required by Taylor. To prove that a question of fact existed with regard to this good-faith requirement, Jones points to several facts in the record, none of which ultimately show a lack of good faith.
First, Jones notes that Aluminum Shapes attempted to transfer Jones back to a union position in 1995 without discussing with him how his physical limitations might affect his ability to perform the requisite tasks. However, Jones concedes that, as soon as he complained and provided a note from his doctor, Aluminum Shapes immediately allowed him to remain in his quality control position for another year. This certainly does not show bad faith on the part of Aluminum Shapes; rather, Jones demonstrates that Aluminum Shapes was quite responsive to his physical limitations.
As another example of "bad faith," Jones points to the fact that Wimmersberger admitted in his deposition testimony that he had not met with Jones in 1996 prior to attempting to transfer him again, because he did not think that such a meeting would be necessary. Once again, this fact does not establish an issue of fact with regard to bad faith. It is undisputed that, prior to the 1996 transfer to the extrusion department, Aluminum Shapes was well acquainted with Jones' physical limitations. Jones' own Appendix contains doctors' letters and testimony which establish that *42 Aluminum Shapes knew by 1996 that Jones was blind in one eye and could not lift heavy objects.
The only piece of evidence that might be deemed to call into question the motivations of Aluminum Shapes is the factual allegation that Wimmersberger stated that "the free ride is over." This statement implies that Wimmersberger felt that Jones was not pulling his weight in the company. A jury might infer from it that some personal animus had arisen between Jones and Wimmersberger. Even this statement, however, could not serve to negate what we consider to be the undisputed fact that the parties initiated and continued a constructive interactive process in which Jones was substantially accommodated except in his desire to work a nonunion job while still enjoying union benefits.
Jones can point to no action on the part of Aluminum Shapes which would establish a reasonable basis on which a jury could establish a finding of bad faith failure to engage in the interactive process. In sum, the undisputed facts are these:
(1) When plaintiff was injured, he was awarded workers' compensation, and took several years off work.
(2) Upon returning, plaintiff made his limitations known, and was not placed in any position to which he had objected. Instead, he was placed into a nonunion position, and allowed to keep his union benefits.
(3) During a downsizing, defendants attempted to transfer plaintiff back to a union job. As soon as plaintiff established that he could not perform the offered positions, he was allowed to keep his current assignment.
(4) When the defendants again attempted to transfer plaintiff to a union job, plaintiff again objected. He was immediately offered his current assignment, on the condition that he accept it as a nonunion position.
Such actions on the part of Aluminum Shapes clearly comport with Taylor's suggestion that "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation... ask the employee what he or she specifically wants, show some sign of having considered employee's request ..." Taylor, 184 F.3d at 317. Aluminum Shapes acquiesced to every one of Jones' requests, except that it would not allow him to remain a union member while working a nonunion job. Good faith in the interactive process cannot rationally be disputed here.
Jones next argues that a jury could have inferred bad faith from Aluminum Shapes' requirement that Jones leave the union. Jones also argues that the motion judge erred when he failed to address whether it would have been an unreasonable or an undue hardship on Aluminum Shapes to have allowed Jones to continue to receive his union benefits while working in quality control. This "undue hardship" argument is clearly based upon N.J.A.C. 13:13-2.5, which provides in part that:
(b) An employer must make a reasonable accommodation to the limitations of a employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business.
The argument that a jury could have inferred bad faith from Aluminum Shapes' refusal to convert Jones' job into one with union benefits is based on the same flawed premise as the argument that the judge should have examined whether such a conversion would have caused the company undue hardship. Both arguments are *43 grounded in the notion that converting a nonunion job to a union job is the sort of action contemplated by the "reasonable accommodation" requirement of LAD or The Americans With Disabilities Act (ADA). 42 U.S.C.A. § 12112(b)(5)(B). We disagree with such interpretation of LAD and ADA. The issue of the status of Jones' job as union or nonunion should not be construed to be part of the universe of "reasonable accommodations" as envisioned under LAD and our federal anti-discrimination laws. Therefore, Aluminum Shapes' refusal to convert Jones' job to union status creates neither a question of good faith in the interactive process, nor an issue of fact with regard to undue hardship.
ADA states that "discrimination" can include "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." N.J.A.C. 13:13-2.5(b) mirrors this language, stating in part that "An employer must make a reasonable accommodation to the limitations of a employee or applicant who is a person with a disability..." Under both ADA and the Code, the language makes it plain that the phrase "reasonable accommodation" refers to the duty of an employer to attempt to accommodate the physical disability of the employee, not to a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits or remuneration.
This interpretation is supported by the remainder of N.J.A.C. 13:13-2.5(b), which states that:
1. Under circumstances where such accommodation will not impose an undue hardship on the operation of an employer's business, examples of reasonable accommodation may include:
i. Making facilities used by employees readily accessible and usable by people with disabilities;
ii. Job restructuring, part-time or modified work schedules;
iii. Acquisition or modification of equipment or devices; and
iv. Job reassignment and other similar actions.
Similarly, ADA provides a definition of reasonable accommodation:
(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.
[42 U.S.C.A. § 12111(9).]
Although these are not meant to be exhaustive lists of accommodation, the accommodations listed in ADA and the Code provision above all share a common feature; they are all designed to make certain changes in the work environment or structuring of employees' time that will allow disabled employees to remain at work without their physical handicaps impeding their job performance.
Regarding the issue of an employer's obligation to provide a job of exactly the same status as that previously held by the employee, courts have specifically held that, in fact, employers may accommodate disabled employees by offering jobs that are considered demotions, if no lateral transfers are available. See Smith v. Midland Brake, 180 F.3d at 1177. There is no *44 precedent for the proposition that, if a disabled employee must be demoted in order to accommodate his or her disability, then the job description must be changed to reflect the level of benefits or compensation of the employee's original job. Neither is there a basis for judicial interference with existing collective bargaining agreements that describe the bargaining unit.[3]
In the instant case, Aluminum Shapes offered Jones a position in quality control that reasonably accommodated Jones' disability, after unsuccessful attempts to place him in a number of bargaining unit jobs. Jones rejected it. Even if the fact that the job carried no union benefits were to be seen as an effective demotion of Jones, the record before us does not establish that there was any union job that Jones could perform safely. It is uncontested that the position held by Jones was historically a nonunion position. While Aluminum Shapes previously allowed Jones to retain his union status while working in quality control, the LAD does not require that Aluminum Shapes continue to do so. The issue of union status here does not affect the accommodation of Jones' actual disability.
According to Midland Brake, "[T]he employer is free to choose the reassignment that is to be offered to the qualified individual with a disability. If the disabled individual rejects that assignment, the employer is under no obligation to continue offering other assignments ... Once the employer has offered such a reassignment, its duties have been discharged." Ibid.
Because substantial accommodations were made as the result of interaction, we hold that the accommodation efforts were reasonable as a matter of law. An employer is not required to comply with every request of a disabled employee in order to avoid a jury trial in a LAD case. Brill requires that the motion judge, as here, engage in a careful review of the discovery and certifications to determine whether there is more than a mere disagreement between two interacting parties. Specifically, we hold that reasonable accommodation of a physical disability does not require an employer to assign a union worker to a job within the union bargaining unit if there are no open bargaining unit jobs which the employee can perform safely. Further, absent a specific provision in the collective bargaining agreement, we find no basis in the LAD to require an employer to convert the available job to one covered by the union contract.
We also reject Jones' assertion that he was "constructively discharged" from his quality control position. In Woods-Pirozzi v. Nabisco Foods, 290 N.J.Super. 252, 275-276, 675 A.2d 684 (App.Div.1996), we held that a constructive discharge occurs when "the employer knowingly permit[s] conditions of employment so intolerable that a reasonable person subject to them would resign." The "intolerable conditions" described by Jones consisted of the employer's decision not to convert the non-bargaining unit job de facto into a union job.
The argument lacks merit. The phrase "intolerable conditions" conveys a sense of outrageous, coercive and unconscionable requirements. In Woods-Pirozzi, plaintiff quit her job after being subjected to persistent taunting by male *45 coworkers that was often overtly sexual and extremely rude, and she was on one occasion fondled by an elderly security guard. Even there, we held that a constructive discharge claim was properly dismissed. Ibid. We cannot conclude that the assignment of a nonunion position to Jones as an attempted reasonable accommodation is so intolerable to a reasonable person as to amount to a constructive discharge.
We conclude that Aluminum Shapes fulfilled its duties under LAD. They offered Jones the only available position that accommodated his disability, which, to Jones, amounted to a demotion. He simply rejected the position, and refused to return to work. Aluminum Shapes was required under the LAD to do no more.
Affirmed.
NOTES
[1] The appeal deals exclusively with the LAD claims against Aluminum Shapes. We, therefore, deem the intentional infliction of emotional distress claims and any causes of action asserted solely against Wimmersberger abandoned.
[2] The "tail stretcher" position involves placing one end of a newly-extruded piece of aluminum product into a clamp, and, in conjunction with the "head stretcher" (a worker on the other end of the aluminum piece), stretching the new product into its proper form and strength.
[3] On a related note, the Third Circuit, in Kralik v. Durbin, 130 F.3d 76 (3d Cir.1997) has held that the "reasonable accommodations" requirement of the ADA does not require that an employer violate a seniority system established as part of a collective bargaining agreement.