861 A.2d 156 (2004)
373 N.J. Super. 239
Bruno BUMBACA, Plaintiff-Appellant,
v.
TOWNSHIP OF EDISON, Township of Edison Fire Department and Chief Robert Campbell, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 2004.
Decided November 19, 2004.
*157 Charles Z. Schalk, Somerville, argued the cause for appellant (Mauro, Savo, Camerino & Grant, attorneys; Mr. Schalk, of counsel, and on the brief).
Stacey D. Adams, Teaneck, argued the cause for respondents (DeCotiis, Fitzpatrick, Cole, & Wisler, attorneys; Ms. Adams and Thomas A. Abbate, of counsel, and on the brief).
*158 Before Judges A.A. RODRIGUEZ, WEISSBARD and HOENS.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
Plaintiff, Bruno Bumbaca, appeals from an order of summary judgment dismissing his complaint against defendants, Township of Edison, Township of Edison Fire Department (EFD), and Fire Chief Robert Campbell, which had alleged that defendants discriminated against plaintiff based upon familial status in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, by failing to hire plaintiff as a full-time paid firefighter (count one), breached a contract by failing to hire him (count two), and discharged him wrongfully in violation of public policy (count three). Plaintiff sought specific performance appointing him as a full-time firefighter with pay retroactive to the date of original hire, lost wages, benefits and monetary loss, compensatory and punitive damages, and counsel fees and costs.[1] We affirm.
The EFD is made up of both volunteer and paid firefighters. Plaintiff has served as a volunteer firefighter with the EFD since 1995. To become a volunteer firefighter, an applicant must complete an application, pass a medical examination, pass a background check, and complete training. An individual will be precluded from becoming a volunteer firefighter only if he or she has a medical problem that prevents him or her from performing the required duties or if he or she has been convicted of arson. Plaintiff was uncompensated financially for his work as a volunteer firefighter. He did, however, receive benefits given to all volunteer firefighters, including insurance coverage, while responding to fire calls, training, and a small stipend.
Pursuant to N.J.S.A. 40A:14-44, any appointment to the paid fire department must be from members of the volunteer company who have served as active firefighters for at least two years. To be classified as "active," volunteer firefighters must respond to twenty-five percent of all fire calls annually. The EFD calculates the yearly percentage of calls made by each firefighter every November.
Every two or three years, the EFD administers a series of tests to all active volunteers interested in becoming paid firefighters. These tests include a written test, a physical performance test, an initial and final oral examination, and an essay test. The composite scores are used to rank individuals to determine the order of appointment to paid firefighter positions. The rankings are then recorded on a list. When a position becomes available, the person ranked first becomes eligible for appointment and proceeds through the application process, which includes a medical examination, a psychological evaluation, and a criminal background check. The Edison Municipal Code mandates that a candidate not be eligible for hire if he or she fails any one of the required tests. However, an individual who fails a medical or psychological examination may be placed on the next list, when compiled, and be retested at that time. If the highest ranked candidate on the list forfeits appointment by failing one of the tests, the EFD proceeds to the next individual on the list, and so on.
On June 30, 1998, defendant was placed fifteenth out of forty-four on the ranking *159 list. There were fifteen openings for paid firefighter positions during the three-year period that the June 30, 1998 list was in effect. Between June 1998 and December 2000, the EFD hired eight paid firefighters and passed over two individuals. Three of the eight hired were related to current or former Edison employees.
In December 2000 or January 2001, the EFD determined that it could hire an additional six paid firefighters. The next nine candidates on the list were, in order: Paul Toth, Wayne Enoch, Michael Maurath, Anthony Vicidomini, plaintiff, Raymond Ricci, William Pelligrino, Allan Yourstone, Jr., and Herbert Eayres. Ricci chose not to apply.
Defendant was called into Chief Campbell's office with the other seven candidates, given a uniform and was told he was "getting hired," not that he was hired. Plaintiff knew all eight candidates were not going to receive jobs because the Township had only six openings. According to plaintiff, EFD Training Officer Bert Sofield told him and the others not to answer calls as volunteers "so as not to jeopardize [their] hires as full-time firefighters by getting hurt."
Plaintiff passed the required medical examination on January 22, 2001. On February 6, 2001, plaintiff underwent the psychological examination at the Institute for Forensic Psychology (IFP). All eight candidates were examined by IFP, which has been conducting examinations for Edison Township since at least 1995. Amie B. Wolf, Ph.D., a New Jersey licensed psychologist, was the principal examiner in plaintiff's evaluation. The examination consisted of eight different psychological tests and a personal interview with Dr. Wolf.
Dr. Wolf concluded that plaintiff did not possess the psychological characteristics required for the position sought. She summarized her findings as follows:
Overall, the candidate exhibited a number of areas of concern. One is the arrest for drugs and assault. When this is combined with the fact that he continues to drink twice a week, it does raise a question about his commitment to abstinence. His performance and motivation in high school, as well as his lack of college education do not demonstrate ongoing commitment to developing himself and developing his level of serious-mindedness. He endorsed numerous critical items on the `COPS' test that suggest areas of difficulty. He also endorsed gender bias items which were of concern.
Overall, although the candidate has many positive qualities in some areas, there are enough areas of concern that at present he cannot be recommended for appointment.
The "COPS" (Candidate and Officers Personnel Survey) test is a research based biographical data instrument. The COPS test predicted that plaintiff's probable success, as a public safety officer, is "very poor."
Chief Campbell informed plaintiff "the day before the hiring" that Dr. Wolf had not recommended him for a firefighter's position and, as a result, he could not be appointed. Campbell testified that if plaintiff had passed the exam, he would have hired him. Campbell also certified that he had no contact with IFP or Dr. Wolf regarding the psychological examination. Another of the eight applicants, Anthony Vicidomini, was passed over for appointment based upon his psychological examination results. Significantly, Vicidomini's brother is a dispatcher for Edison Township.
The six individuals hired as paid firefighters were: Paul Toth, Wayne Enoch, *160 Michael Maurath, William Pellegrino, Allan Yourston, and Herbert Eayres. Plaintiff claims that those appointed, with the exception of Paul Toth, who allegedly sued the department, had far worse psychological examinations for employment as a paid firefighter and more extensive criminal histories than he, and the reason they were hired was that they had a relative employed by Edison Township in the past or at present. Dr. Wolf recommended all six of those hired.
Plaintiff hired an independent forensic psychiatrist, N. Frank Riccioli, M.D., to determine his emotional fitness to be a firefighter. Dr. Riccioli administered one psychological test and strongly recommended plaintiff for a position as a firefighter "in view of a complete absence of negative features...."
On appeal, plaintiff advances three arguments for reversal:
Point I
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT DISMISSING THE FIRST COUNT OF PLAINTIFF'S COMPLAINT ALLEGING FAMILIAL STATUS DISCRIMINATION UNDER NEW JERSEY'S LAW AGAINST DISCRIMINATION.
POINT II
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT DISMISSING THE SECOND COUNT OF THE COMPLAINT ALLEGING PROMISSORY ESTOPPEL AND BREACH OF CONTRACT.
POINT III
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT DISMISSING THE THIRD COUNT OF THE COMPLAINT ALLEGING COMMON LAW PUBLIC POLICY WRONGFUL DISCHARGE.
I
THE LAD CLAIM
Plaintiff's LAD claim is based upon the contention that references to "familial status" in the statute serve to prohibit, as constituting an unlawful employment practice, the practice of nepotism, which has been defined as "favoritism shown by persons in office to relatives or close friends, especially in granting jobs." Webster's II New College Dictionary 743 (1995)[2]. In this case, the practice is alleged to be favoritism in the hiring of paid firefighters shown to relatives or friends of Edison Township employees. We reject plaintiff's argument, concluding, as did Judge Ryan, that the LAD does not prohibit this hoary practice.
We fully agree with plaintiff that the LAD is remedial legislation which must be liberally construed. McDonnell v. State of Illinois, 319 N.J.Super. 324, 340, 725 A.2d 126 (App.Div.), aff'd, 163 N.J. 298, 748 A.2d 1105, cert. denied, 531 U.S. 819, 121 S.Ct. 59, 148 L.Ed.2d 26 (2000). Nevertheless, liberality of interpretation does not require turning a blind eye to the plain meaning of the statute, which is always our starting point. See Singleton v. Consolidated Freightways Corp., 64 N.J. 357, 362, 316 A.2d 436 (1974) ([W]hile liberality of construction of remedial legislation is desirable [the courts] cannot ignore *161 the plain meaning of the language employed by the Legislature"). Of necessity, then, we begin by quoting the pertinent sections of the LAD.
N.J.S.A. 10:5-3 sets forth the purposes of the LAD:
The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, disability or nationality, are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State; provided, however, that nothing in this expression of policy prevents the making of legitimate distinctions between citizens and aliens when required by federal law or otherwise necessary to promote the national interest.
The Legislature further declares its opposition to such practices of discrimination when directed against any person by reason of the race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, liability for service in the Armed Forces of the United States, disability or nationality of that person or that person's spouse, partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers, in order that the economic prosperity and general welfare of the inhabitants of the State may be protected and ensured.
The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
(Emphasis added.)
N.J.S.A. 10:5-4 sets out the general sweep of the entire statutory scheme:
All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.
(Emphasis added.)
On the other hand, N.J.S.A. 10:5-12 sets out at length the specifics of those practices deemed to constitute "an unlawful employment practice, or, as the case may *162 be, an unlawful discrimination." Subsection a of N.J.S.A. 10:5-12(a), addresses unlawful employment practices. In operative part, it constitutes an unlawful employment practice
[f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, genetic information, sex, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.
Notably, that subsection contains no reference to familial status, the concept upon which plaintiff bases his argument. However, subsection g does embrace familial status, as follows, making it a discriminatory practice,
[f]or the owner, lessee, sublessee, assignee or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent, lease, assign, or sublease any real property or part or portion thereof, or any agent or employee of any of these:
(1) To refuse to sell, rent, lease, assign, or sublease or otherwise to deny to or withhold from any person or group of persons any real property or part or portion thereof because of race, creed, color, national origin, ancestry, marital status, domestic partnership status, sex, affectional or sexual orientation, familial status, disability, nationality, or source of lawful income used for rental or mortgage payments;
(2) To discriminate against any person or group of persons because of race, creed, color, national origin, ancestry, marital status, domestic partnership status, sex, affectional or sexual orientation, familial status, disability, nationality or source of lawful income used for rental or mortgage payments in the terms, conditions or privileges of the sale, rental or lease of any real property or part or portion thereof or in the furnishing of facilities or services in connection therewith....
[N.J.S.A. 10:5-12(g)[3] (emphasis added)].
Familial status is defined as:
being the natural parent of a child, the adoptive parent of a child, the foster parent of a child, having a "parent and child relationship" with a child as defined by State law, or having sole or joint legal or physical custody, care, guardianship, or visitation with a child, or any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.
[N.J.S.A. 10:5-5(ll)]
Thus, it is clear that the term familial status, as defined, does not include the concept of nepotism and, further, plays no role in the statutory definition of an unlawful employment practice. The term was, *163 in fact, not a part of the LAD as originally drafted in 1945, nor was it the subject of amendments in 1951, 1962, 1970 and 1991. It was only added in 1992, for the stated purpose of prohibiting "discrimination in housing on the basis of familial status." As further explained in a section that became N.J.S.A. 10:5-9.2:
The provisions of this amendatory and supplementary act, P.L.1992, c. 146 (C.10:5-12.4 et al.), are intended to permit the Division on Civil Rights in the Department of Law and Public Safety to qualify as a "certified agency" within the meaning of the Federal Fair Housing Amendments Act, Pub.L. 100-430 (42 U.S.C. 3610(f)), and shall be construed as consistent with that purpose. Nothing in this amendatory and supplementary act, P.L.1992, c. 146 (C.10:5-12.4 et al.) shall be construed to permit conduct prohibited by "the Law Against Discrimination," P.L.1945, c. 169 (C.10:5-1 et seq.), prior to the effective date of this act, nor is it intended to be construed to prohibit conduct now permitted.[4]
As a result, while we do not endorse nepotism to the extent that it promotes hiring on a basis other than merit, the practice is clearly not prohibited by the LAD, even if plaintiff fell within the statutory definition, which he does not. Accord Hayman v. Funk, 8 N.J.A.R. 27, 39-40 (Div. on Civil Rights 1984). Finally, having been directed to look "to federal law as a key source of interpretive authority" for substantive standards under the LAD, Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990), we note that federal decisions have likewise held that nepotism does not fall within the practices prohibited by the LAD's counterpart, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2. Betkerur v. Aultman Hosp. Assn., 78 F.3d 1079, 1096 (6th Cir.1996); Holder v. City of Raleigh, 867 F.2d 823, 825-26 (4th Cir.1989).
Plaintiff claims that there are "many unreported employment cases which cite to familial status discrimination in the context of workplace discrimination." However, a review of those cases reveal that each involved a claim of employment discrimination based on a prohibited category, such as race, age or gender, specifically listed in the LAD sections that address employment discrimination. The references to familial status in those cases was simply part of a description of the general purposes of the LAD as set out in N.J.S.A. 10:5-3. See, e.g., Taylor v. Metzger, 152 N.J. 490, 498, 706 A.2d 685 (1998); Hernandez v. Region Nine Housing Corp., 146 N.J. 645, 651, 684 A.2d 1385 (1996); Jones v. Aluminum Shapes, Inc., 339 N.J.Super. 412, 420, 772 A.2d 34 (App.Div.2001). Not a single case cited by plaintiff supports his proposition that the LAD prohibits nepotism through its use of the term familial status.[5] The argument has no merit.
Even if plaintiff were correct that nepotism fell within the LAD and that he fell within its scope, his claim would still fail. Assuming that plaintiff's proofs established a prima facie case of discrimination, that proof would give rise to a presumption that the employer unlawfully *164 discriminated against plaintiff. Bergen Commercial Bank v. Sisler, 157 N.J. 188, 210, 723 A.2d 944 (1999). To rebut the presumption, defendants must then come forward with evidence of a legitimate, non-discriminatory, reason for its rejection of plaintiff. Ibid. If defendants produce such evidence, the burden shifts back to plaintiff, who must prove that the reason proffered by defendants was a pretext for discrimination by showing that a discriminatory reason motivated defendants or that defendants' explanation is "unworthy of credence." Id. at 210-11, 723 A.2d 944.
In this case, plaintiff must raise a genuine factual dispute as to whether his failure of the psychological examination was the true reason for the employment decision or merely a pretext for discrimination. See Beatty v. Farmer, 366 N.J.Super. 69, 76, 840 A.2d 856 (App.Div.2004) (holding that the trial court properly granted defendant's motion for summary judgment, dismissing plaintiff's claim for age discrimination when plaintiff, an applicant for a position as a Deputy Attorney General, did not raise a factual dispute as to whether the quality of his writing sample was the true reason for the employment decision). In response to a motion for summary judgment, plaintiff "need not meet the ultimate burden of persuasion, but he must cast such serious doubt on the veracity of the employer's articulated legitimate reason as to allow a jury to reasonably conclude that the employer was motivated to act for the discriminatory reason alleged by plaintiff." Id. at 77, 840 A.2d 856. Plaintiff must demonstrate that a reasonable factfinder could rationally infer that the employer did not act for the stated non-discriminatory reason based upon "implausibilities, inconsistencies, incoherencies or contradictions" in its explanation. Ibid.
We conclude that plaintiff failed to rebut defendants' proffered legitimate and non-discriminatory reason for not hiring him: his failure of the psychological examination. Chief Campbell testified that had plaintiff passed the psychological examination that plaintiff would have been hired. Plaintiff testified that he believed he would have been hired had he passed the exam. Failing a pre-employment examination has been held to be a legitimate, non-discriminatory reason for denying an applicant's employment. Patrolmen's Benevolent Ass'n v. East Brunswick Tp., 180 N.J.Super. 68, 72, 433 A.2d 813 (App.Div.1981) (holding that plaintiff's failure to achieve a passing score on a written examination was a legitimate, non-discriminatory reason for the adverse employment decision and the decision not motivated by gender bias). The exam was entered into the record as were the results of the other eight applicants. The other applicant who was not hired also failed the psychological exam. The others that passed were hired. Also, plaintiff was not able to offer any proof that the real reason the next person on the list, Allan Yourstone, was hired was because he was related to an Edison employee. The other rejected applicant, Anthony Vicidomini, was related to an Edison employee, a dispatcher. Moreover, seven of the fifteen firefighters hired during the relevant time period were unrelated to an Edison employee. Under the circumstances, a reasonable factfinder could not infer that defendants acted based upon their desire to hire only relatives of Edison employees.
To overcome this insurmountable hurdle, plaintiff would have us infer that Campbell, or other high-level municipal officials, conspired with Dr. Wolf to "rig" the outcome of the psychological examinations. No evidence supported this suggestion, which was flatly denied by Campbell and Wolf, both of whom were deposed. We *165 reject plaintiff's attempt to create a positive (the inference of collusion) out of a negative (the denial of collusion). See Zarrillo v. Stone, 317 Mass. 510, 58 N.E.2d 848, 849 (1945); Eckenrode v. Pennsylvania R. Co., 164 F.2d 996, 999 n. 8 (3rd Cir.1947), aff'd, 335 U.S. 329, 69 S.Ct. 91, 93 L.Ed. 41 (1948). Thus, plaintiff has failed to cast doubt upon the veracity of defendants' stated non-discriminatory reason for not hiring him and the trial court's grant of summary judgment was proper.

II
Concerning plaintiff's claim that defendants breached an oral contract to appoint him as a full-time firefighter, we agree with Judge Ryan that plaintiff failed to establish the existence of such a contract, or detrimental reliance sufficient to support a claim of promissory estoppel. We find plaintiff's arguments to be without sufficient merit to warrant extended discussion in this opinion. R. 2:11-3(e)(1)(E).

III
Finally, for the reasons discussed at length above, New Jersey has no public policy prohibiting nepotism. As a result, his claim that his failure to be appointed violated the doctrine of Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 73, 417 A.2d 505 (1980), has no foundation and was properly dismissed. See Warthen v. Toms River Community Memorial Hospital, 199 N.J.Super. 18, 24, 488 A.2d 229 (App.Div.1985) ("identifying the mandate of public policy [for a Pierce claim] is a question of law").
Affirmed.
NOTES
[1] The first count was dismissed on defendants' motion on September 27, 2002. After discovery was completed, defendants moved to dismiss counts two and three. That motion was granted on July 1, 2003.
[2] The word "nepotism" comes from the Latin word for nephew, a historical reference to the practice of popes and other ecclesiastics to show special favor to nephews or other relatives in conferring offices; the unfair preferment of nephews or relatives to other qualified persons. A New English Dictionary on Historical Principles, Vol. VI, Part II, Preface to letter N, p. 93 (Oxford 1908).
[3] Subsections (3) and (4) prohibit other actions by those designated in N.J.S.A. 10:5-12(a) and also refer to familial status. In addition, the balance of the section contains other prohibitions against other persons or institutions, some of which refer to familial status, e.g., N.J.S.A. 10:5-12h(1)-(3), -12i(3), -12k, and some of which do not, e.g., N.J.S.A. 10:5-12l, m.
[4] The sponsor's statement to the Senate Bill also makes this purpose explicit. Statement to Senate Bill No. 340 (March 30, 1992). Indeed, as defendants point out, the federal law, to which the LAD was intended to conform, was amended in a similar manner in 1988. See 42 U.S.C.A. § 3602(k), 3604; Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 832 (9th Cir.), opinion amended on denial of rehearing, 125 F.3d 1281 (9th Cir.1997).
[5] For an example of a law prohibiting nepotism, see N.J.S.A. 52:11-5.1 which prohibits members of the Legislature from employing relatives in their district legislative office.