**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1920-20

JANE ROCKS and
STEPHEN POLLOCK,

    Plaintiffs-Appellants,

v.

PNC INVESTMENTS, LLC
and BRIAN D. DUNN,

    Defendants-Respondents.

_____

Submitted February 16, 2022 – Decided April 4, 2022

Before Judges Hoffman, Whipple, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0114-19.

Zarwin Baum DeVito Kaplan Schaer Toddy, PC, attorneys for appellants (Zachary A. Silverstein, on the briefs).

Seyfarth Shaw, LLP, attorneys for respondents (Howard M. Wexler and Lisa L. Savadjian, of counsel and on the brief).

PER CURIAM

Plaintiffs Jane Rocks and Stephen Pollock appeal from the February 19, 2021 Law Division order granting the summary judgment dismissal of their complaint alleging age discrimination. In their complaint, plaintiffs alleged that defendants, PNC Investments, LLC (PNC) and Brian D. Dunn (plaintiffs' supervisor), violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50 (LAD), by "engag[ing] in discriminatory treatment of plaintiffs because of their age," which "caused a hostile workplace" and their "constructive discharge." We affirm.

I.

We discern the following facts from the record, viewed in the light most favorable to plaintiffs, the non-moving parties. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405-06 (2014). Plaintiffs were employed by PNC as Financial Advisors (FAs). Part of the role of an FA is to get to know PNC branch bank employees so that the employees would refer customers to the FA to set up appointments. Because bank branch employees have many responsibilities, FAs are instructed to speak with them regularly, teaching employees how to identify a potential customer, how to introduce the customer to the FA, and how to overcome a customer's reluctance to meet with an FA. Defendant Dunn,

plaintiffs' regional sales manager, instituted a requirement that FAs meet with fifteen potential customers weekly.

Dunn was in his mid-fifties when he served as plaintiffs' supervisor. Pollock was over the age of fifty when Dunn hired him. At his deposition, Pollock admitted that Dunn never took a branch away from him; in addition, Pollock acknowledged that he voluntarily gave up the Moorestown branch.

Dunn did take one branch – the Springdale branch – from Rocks, in April 2017, seventeen months before her resignation. One of the reasons Dunn took the branch from Rocks was criticism he received about Rocks from the Springdale branch manager, who reported that Rocks had not developed a good rapport with the employees and customers of that branch, and that her attitude was rather abrupt. The branch was reassigned to a new FA, Daniel Burns. Because PNC was creating a new territory for Burns, at the same exact time Dunn reassigned the Springdale branch to Burns, Dunn also reassigned the Lumberton branch from FA Phil Patragnoni to Burns; in addition, Dunn reassigned the Cedar Hill branch from another FA, Dave Dougherty, to Burns. Patragnoni and Dougherty were twenty-five and twenty-three years younger than Rocks, respectively. Rocks voluntarily chose to give up two other

branches, the Meeting House branch and the Mount Laurel branch. Rocks admitted that Dunn had nothing to do with her loss of these two branches.

Pollock regularly spoke of his intent to retire. Pollock announced to several PNC employees – including in a May 4, 2015 email to the President of PNC Investments – that he planned to retire in 2018, at the age of seventy, which is the year he ultimately resigned from PNC. Pollock spoke openly and frequently of his retirement plans with his fellow FAs, including Rocks, Thomas Becker, and Tanya Brown, and also with Dunn. In 2017, Pollock noted in a communication to Becker that he was "going to try to make it one more year. [Seventy] is it." Pollock wrote to Becker that being fired and suing for age discrimination "would be the best thing that could happen!" Pollock boasted to another colleague that – while he had not scheduled his required fifteen appointments – he and Rocks "had an advantage that you don't. We are at retirement age."

Defendants established that plaintiffs failed to meet their revenue goals from 2016 to 2018. Pursuant to PNC policy, an underperforming employee is first placed on a "Performance Evaluation Plan." A verbal warning follows. The next step is a written warning. Probation is the last step in the process. Plaintiffs received verbal and written warnings regarding their performance.

4

In her 2017 evaluation, Rocks received a "meets some expectations" rating. The evaluation noted that she missed her annual revenue goal by twenty-one points, down ten percent from 2016. Although Rocks had missed her goals for several years, Dunn first issued a verbal warning to her on November 1, 2017. At that point, Dunn informed her that she needed to schedule fifteen weekly appointments and demonstrate regular client outreach.

On April 12, 2018, Dunn issued a written warning to Rocks because she was not creating enough activity to meet her weekly appointment goal. Dunn further noted that Rocks added just one client from November 2017 to March 2019. Beginning July 9, 2018, Dunn officially placed Rocks on probation, which was set to end October 7, 2018. The Probation Notice provided:

> Jane is not meeting expected performance behaviors and activities of a Financial Advisor. Specifically, Jane is not creating enough activity to meet a set appointment goal. The goal is [fifteen] per week and Jane has been averaging [ten] per week since her written warning. Planning in 2018 has been inconsistent overall. When it comes to coaching employees, providing quick starts, effectively participating in multi-channel appointments, and reviewing insights for opportunities[,] the outcomes have been inconsistent as it pertains to increased activity and business outcomes.

A-1920-20

Rocks admitted her revenue targets decreased yearly, rather than increased, until her resignation. Rocks resigned on September 28, 2018, just before the end of her probation period.

As for Pollock, his 2017 year-end evaluation stated that he "meets some expectations," but noted that he was behind his revenue goal and flat versus his 2016 pace. In his 2018 mid-year evaluation, Pollock was at sixty-four percent of his annual revenue goal, and rated as "does not meet expectations." Pollock explained that his sales of fixed annuities were not paying as well as they were previously, which he acknowledged was not Dunn's fault.

On November 1, 2017, Pollock received a verbal warning from Dunn, and they met twice to review certain expectations moving forward. These expectations included Pollock scheduling fifteen weekly appointments, keeping his manager apprised of his activities, weekly check-ins, participation in "branch call night," and coaching branch employees. Pollock said he assumed all these tasks were within the requirements of all FAs who reported to Dunn.

Following the verbal warning, Dunn issued a written warning to Pollock, on April 11, 2018, stating that Pollock was not meeting expected performance "of the PNC Investment Advisor position." The warning noted that Pollock was not creating enough activity with his clients, referrals, and branch customers to

meet his weekly appointment requirement. The warning stated that "immediate and sustained improvement is required." The warning further noted that Pollock had "[zero] new clients" between November 1, 2017, and February 28, 2018.

On June 20, 2018, Dunn placed Pollock on probation. The notice stated under "Corrective Action Details":

> Steve is not meeting the expected performance and behaviors of the Investment Advisor position. Specifically, Steve is not creating enough activity between his clients, referrals, and prospects that come into the branch to meet the appointment expectation. The goal is [fifteen] appointments weekly, however, since his written warning Steven has been averaging [six] per week.

Pollock's probation expired on September 20, 2018. After the probation period ended, Pollock voluntarily resigned on September 28, 2018. Plaintiffs admitted that they have no information regarding who, if anybody, made the decisions relating to the activity or revenue goals set for them. Notably, Dunn testified that he did not set these goals, and that they were set by the Finance Department, after undertaking an analysis of the branches each FA served year to year.

The record does not indicate that Dunn instituted the weekly tracking requirements to burden or single out Rocks or Pollock. Six other FAs, with ages ranging from thirty-one to fifty-nine, were also required to submit to Dunn

7

weekly appointment tracker reports because they were under ninety percent of their revenue goals. Of the six other FAs required to submit weekly tracking reports to Dunn, four were under the age of forty when plaintiffs resigned on September 28, 2018.

Plaintiffs admitted that Dunn maintained the same expectations for plaintiffs as he did for all FAs. Furthermore, plaintiffs admitted Dunn had no requirements for plaintiffs that were not also required from other FAs. Dunn required fourteen FAs to have weekly calls with him and submit weekly appointment trackers, including plaintiffs' witness, Litwin. Dunn's other FAs, many of whom who were under forty, all were required to schedule fifteen appointments weekly. Dunn also had weekly calls with Litwin, required him to submit an appointment tracker, and to schedule fifteen weekly appointments. Dunn also issued both verbal and written warnings to Litwin for insufficient business activity.

The record does not indicate anyone at PNC, including Dunn, ever singled out plaintiffs for discriminatory or derogatory comments regarding their age. While employed at PNC, Rocks reported to PNC that Dunn discussed retirement with her; however, she admitted she did not feel pressured to retire. Plaintiffs complain only of Dunn's comments regarding what he would do when

8

he retired. Pollock admitted Dunn merely relayed his own retirement plans during these conversations. Dunn acknowledged that he discussed his own hypothetical retirement plans with Pollock, recounting that he would say "my plans are . . . when I get to [sixty] or [sixty-five], . . . I'm going to be on a beach somewhere."

Pollock began looking for a job as soon as he received the verbal warning in 2017 and had been discussing leaving PNC with Litwin since that point and looking for a new job. Plaintiffs, along with Litwin, began working at LPL Financial the day after they resigned.

On January 10, 2019, Rocks and Pollock filed a complaint against defendants, asserting claims for 1) violation of the LAD; 2) defamation; and 3) tortious interference with prospective business relationship. Following discovery, defendants moved for summary judgment in January 2021, seeking dismissal of plaintiffs' complaint in its entirety. Plaintiffs filed opposition to defendants' motion as to their LAD claims; however, plaintiffs withdrew their claims for defamation and tortious interference. On February 19, 2021, following oral argument, the trial court granted defendants' motion for summary judgment, dismissing plaintiffs' LAD claims.

II.

"We review de novo the trial court's grant of summary judgment, applying the same standard as the trial court." Abboud v. Nat'l Union Fire Ins., 450 N.J. Super. 400, 406 (App. Div. 2017) (citing Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). This standard mandates the grant of summary judgment "if the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).

"An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Ibid. The trial court should not hesitate to grant summary judgment "when the evidence 'is so one-sided that one party must prevail as a matter of law.'" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The LAD provides, in relevant part:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

> a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, gender identity or expression [or] disability…to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment

> . . . .

[N.J.S.A. § 10:5–12(a).]

Prima Facie Case of Age Discrimination

To establish a prima facie case of age discrimination, "an employee must 'show that the prohibited consideration played a role in the decision-making process and that it had a determinative influence on the outcome of that process.'" Bergen Com. Bank v. Sisler, 157 N.J. 188, 207 (1999) (citations omitted). To prove employment discrimination under the LAD, New Jersey courts have adopted the burden-shifting analytical framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Viscik v. Fowler Equip. Co., 173 N.J. 1, 13-14 (2002).

11

To successfully assert a prima facie case of age discrimination under the LAD, plaintiffs must show that: 1) they were members of a protected group; 2) their job performance met their employer's legitimate expectations; 3) they were terminated; and 4) the employer replaced or sought to replace them. Nini v. Mercer Cnty. Cmty. Coll., 406 N.J. Super. 547, 554 (App. Div. 2009) (citing Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005)) aff'd, 202 N.J. 98 (2010).

If a plaintiff presents such a prima facie case under the McDonnell framework, the defendant must then offer a legitimate, nondiscriminatory reason for the action. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000); Barbera v. DiMartino, 305 N.J. Super. 617, 634 (App. Div. 1997), certif. denied, 153 N.J. 213 (1998). Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, it becomes the plaintiff's burden under the McDonnell test to persuade the jury that the employer's asserted business reasons were only a pretext for discrimination. Reeves, 530 U.S. at 143; see also DeWees v. RCN Corp., 380 N.J. Super. 511, 523-24 (App. Div. 2005).

Plaintiffs contend that Dunn discriminated against them because of their age by speaking with plaintiffs about retirement and by subjecting plaintiffs to the weekly appointment requirements. This argument lacks merit.

Dunn's comments about retirement were about his personal plans and wishes for his own retirement. The record simply does not support plaintiffs' contention that Dunn made these comments with an eye toward forcing plaintiffs to resign.

Subjecting plaintiffs to the weekly appointment requirement also did not constitute age discrimination. As noted by defendants, plaintiffs were not the only FAs subjected to the weekly appointment requirements, but several other younger FAs also had to satisfy the weekly appointment requirements. The record plainly does not support plaintiffs' contentions that the weekly appointment requirements constituted age discrimination in violation of the LAD.

Hostile Work Environment

"Our review of a hostile work environment claim requires us to consider the totality of the circumstances." El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 178 (App. Div. 2005) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993)). To establish a hostile work environment claim under the

LAD, a plaintiff must satisfy each prong of a four-part test.  Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002).  The plaintiff must establish "the complained-of conduct 1) would not have occurred but for the employee's protected status, and was 2) severe or pervasive enough to make a 3) reasonable person believe that 4) the conditions of employment have been altered and that the working environment is hostile or abusive."  Ibid. (citing Lehmann, 132 N.J. at 603-04).

The inquiry is whether a reasonable person in a plaintiff's position would consider the alleged discriminatory conduct "to be sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment."  Ibid. (quoting Heitzman v. Monmouth Cnty., 321 N.J. Super. 133, 147 (App. Div. 1999)).

The test is strictly objective: whether a reasonable person in the plaintiff's position would consider the work environment hostile.  Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008).  A constructive discharge occurs when an employer engages in "severe or pervasive" conduct that is "so intolerable . . . a reasonable person would be forced to resign rather than continue to endure it."  Shepherd, 174 N.J. at 28 (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001)).  "[T]he standard

14

envisions a 'sense of outrageous, coercive and unconscionable requirements.'" Ibid. The heightened standard demanded for proof of a constructive discharge claim recognizes an employee's "obligation to do what is necessary and reasonable to remain employed rather than" resign or retire. Ibid. (quoting Shepherd, 336 N.J. Super. at 420). The proofs required to establish a constructive discharge are objective, i.e., whether a "reasonable person" would have resigned. Ibid.; see also Muench v. Twp. of Haddon, 255 N.J. Super. 288, 302 (App. Div. 1992).

The record does not show that plaintiffs suffered from a hostile work environment. Dunn's statements to plaintiffs about retirement mostly concerned his own plans and wishes for retirement. Dunn's comments were innocuous and infrequent. Accordingly, we are satisfied that Dunn's comments about retirement were not "severe or pervasive enough to alter the conditions of employment and create an intimidating, hostile, or offensive work environment." El-Sioufi, 382 N.J. Super. at 178.

The record clearly shows that plaintiffs did not suffer a constructive discharge as FAs at PNC Investments. The weekly appointment requirements may have been burdensome, but the requirements were based on plaintiffs' subpar performance. The weekly appointment requirements were imposed to

increase the performance of low-producing FAs. Indeed, the weekly appointment requirements could hardly be considered "outrageous, coercive, or unconscionable requirements." Shepherd, 174 N.J. at 28.

We discern no indication the weekly appointment requirements were so burdensome that a reasonable person would rather resign than endure them. Ibid. The weekly appointment requirements were implemented to increase business, rather than to punish under-performing FAs. Even if the weekly appointment requirements were perceived as punitive in nature, plaintiffs provided no evidence that the requirements were punitive as applied to plaintiffs because of their ages.

In sum, the evidence in the record before us, even when viewed in the light most favorable to plaintiffs, does not support either a prima facie case of age discrimination or a hostile work environment. Accordingly, we are satisfied the trial court properly granted summary judgment in defendants' favor.

Any arguments not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16