**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2426-21

KENNETH REID,

     Plaintiff-Appellant,

v.

CITY OF PLAINFIELD,
and CARL RILEY,

     Defendants-Respondents,

and

ADRIAN MAPP,

     Defendant.

_____

Submitted February 12, 2024 – Decided March 15, 2024

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-3967-17.

O'Connor, Parsons, Lane & Noble, LLC, attorneys for appellant (Gregory Brian Noble and Robert Arthur Ballard, III, of counsel and on the brief).

Rainone Coughlin Minchello, LLC, attorneys for respondent City of Plainfield (John F. Gillick, of counsel and on the brief).

Antonelli Kantor Rivera, attorneys for respondent Carl Riley (Daniel Antonelli, of counsel and on the brief; Richard Joseph Birch, on the brief).

PER CURIAM

Plaintiff Kenneth Reid appeals from the trial court's January 11, 2022 summary judgment order dismissing his second amended complaint against defendants the City of Plainfield, the Plainfield Police Department ("Plainfield PD"), and the Director of the Plainfield PD Carl Riley, with prejudice.[1] Plaintiff further appeals the trial court's March 4, 2022 order denying his motion for reconsideration. We affirm.

## I.

Plaintiff was employed by the Plainfield PD since 1984 and rose to the rank of lieutenant. At the time of his retirement, he was fifty-eight years old. Plaintiff was assigned to the Patrol Bureau.

On December 2, 2015, the Plainfield PD was dispatched for a single motor vehicle accident involving an intoxicated driver. Officer Stephen Bailey and

---

[1] Plaintiff does not appeal the trial court's order granting summary judgment and dismissing the complaint as to Mayor Adrian Mapp.

Sergeant Scott Gwinn noted the driver was unconscious and unable to communicate. Suspecting the driver was intoxicated, they requested a blood draw search warrant ("blood warrant"). Because Officer Bailey had never applied for a blood warrant, Sergeant Gwinn called in Officer Carl-Magnus Kallner to assist. While Officer Kallner began the paperwork, Officer Bailey searched for the driver's identification but was only able to locate the vehicle's registration.

The two officers then called a Union County Assistant Prosecutor, who asked if they could positively identify the driver. The Assistant Prosecutor advised she would not approve the warrant without properly identifying the driver. Officer Bailey, at the direction of Officer Kallner, later misrepresented they had obtained the driver's identity, and a search warrant was issued. Officer Kallner admitted he coached Officer Bailey to tell the prosecutor there was a positive identification when in fact there was none.

After returning from the hospital, Officer Bailey felt uncomfortable with what occurred and advised plaintiff, his commanding officer. Plaintiff advised Bailey he had a personal relationship with the Assistant Prosecutor and that he would contact her the following morning about what occurred. However, plaintiff never contacted the Assistant Prosecutor. Five days later, Officer

Bailey went to the Prosecutor's Office, believing plaintiff had already contacted the office, and apologized to the prosecutor involved with the issuance of the warrant. She advised Bailey she had no idea what had transpired. The Prosecutor's Office subsequently conducted an investigation. On February 2, 2016, the Prosecutor's Office advised Director Riley it had decided not to pursue criminal charges, but because plaintiff had not notified the Prosecutor's Office, it recommended administrative discipline against him and the other officers for their respective involvement in the incident.

In late January 2016, just before the internal affairs investigation commenced for the blood warrant episode, Director Riley brought separate disciplinary charges against plaintiff for "failing to properly supervise" Sergeant Gwinn, who allegedly spent a significant amount of time engaged in prohibited computer activity while on duty. Plaintiff was ultimately charged for failing to submit a report requested by his supervisor, Captain Kevin O'Brien,[2] as well as failing to supervise Sergeant Gwinn, and was given a four-hour suspension on February 2, 2016. Plaintiff contends this was the beginning of defendants building a case against him to force him to retire. During this time period and

---

[2] As of January 11, 2016, Captain O'Brien had been assigned as plaintiff's supervisor in the Patrol Bureau. Captain O'Brien requested a report regarding Gwinn's prohibited computer activity.

A-2426-21

shortly before plaintiff went on sick leave in early February 2016, plaintiff alleges that Lieutenant Craig Venson, at the request of Captain O'Brien, asked him his age and suggested he should retire.

On February 11, 2016, approximately a week after the Plainfield PD's internal affairs unit initiated an investigation regarding the December 2015 blood warrant, plaintiff was admitted to the hospital for what he described as a "minor stroke." While he was hospitalized, Director Riley and another officer visited him. During the visit, plaintiff testified Director Riley and the other officer asked him how old he was and when he was considering retirement. He testified Director Riley also referenced the disciplinary charges and told him these charges could "all go away" if he retired. Plaintiff interpreted these statements as a threat. Director Riley also testified that while he was speaking to plaintiff in the hospital, the concepts of retirement and plaintiff's pending disciplinary action were discussed but that retirement was first brought up by plaintiff.

On February 24, 2016, plaintiff received a preliminary notice of disciplinary charges pending a final hearing regarding the blood warrant incident. The notice alleged he failed to: take appropriate action concerning illegal activity; provide proper training; report perjury; and report to the

5

Director. It also stated he provided misleading information to the Prosecutor's Office. Plaintiff was charged with conduct unbecoming of a public employee, N.J.A.C. 4A:2-2.3(a)(6), and other sufficient cause for failing to properly supervise, N.J.A.C. 4A:2-2.3(a)(12). Director Riley authorized the notice of disciplinary action, wherein he sought to demote plaintiff to the position of sergeant.

After Director Riley spoke to plaintiff at the hospital, plaintiff's sister and her friend organized multiple rallies with members of the community to show support for plaintiff because he thought he was being discriminated against. Plaintiff's son, who is a Franklin Township police officer, attended one of the rallies. After his son spoke at the rally, plaintiff testified that two members of the Franklin Township Police Department approached plaintiff at his house to tell him that a member of the Plainfield PD sent them a tape of his son speaking in an effort to have his son suspended. During his deposition, Lieutenant William Tyler of the Plainfield PD admitted he reached out to the Franklin Township Police Department concerning plaintiff's son's involvement in the rally, citing a "safety concern." Lieutenant Tyler was not present at the rally but received that information from Captain O'Brien.

A-2426-21

On April 29, 2016, plaintiff and the City, including the Plainfield PD, entered into a stipulation of settlement that resolved the disciplinary charges. Plaintiff was represented by counsel. Under the settlement, plaintiff agreed to retire and withdraw his request for a hearing regarding the disciplinary charges. He acknowledged he "did not engage in the proper supervision of subordinates," and he did not advise the Prosecutor's Office or others about the "seriousness and inadequacy of the investigation and conduct of subordinate officers under [his] command." The settlement provided the Plainfield PD would withdraw all pending disciplinary charges against plaintiff, and he could retire in "good standing."

Plaintiff alleges he was forced to retire and was replaced by either Officer David Belle or Officer Christopher Sylvester, both of whom were promoted to lieutenant in February 2017. They were also both younger than plaintiff. Defendants note that seven months after plaintiff's retirement, Officer Belle was transferred to plaintiff's former platoon and eventually promoted to lieutenant based on a civil service exam given in 2014. Moreover, Officer Belle did not replace plaintiff, because plaintiff had been transferred from patrol to the administrative bureau in March 2016.

In addition to the February hospital incident, plaintiff claims Director Riley would randomly ask him how old he was and when he was going to retire. He also claims he had diabetes, coronary artery disease, and hypertension, and this was known within the Plainfield PD. However, after plaintiff's February 2016 hospitalization, and prior to his May 2016 retirement, he did not request any accommodation or light duty assignment. He was also not aware of any physician indicating he was disabled or unable to return to work.[3]

Plaintiff retired on May 1, 2016. He testified he was forced to sign the stipulation and retire rather than face a demotion because Director Riley told him, "this can all go away." After his retirement, plaintiff received an audio recording of Director Riley that was recorded by Jeffrey Courtney, a firefighter with the City. In the recording, Director Riley made the statement, "Chief Tidwell[4] thinks he's Teflon. . . . [Plaintiff has] been Teflon for years but look where he's at." During his deposition, Director Riley confirmed that he made that statement, but it regarded a situation where he transferred plaintiff to a

_____

[3] Plaintiff did produce an expert report regarding his disability, which was mentioned by the trial court. Defendants assert this report was not produced in discovery. We need not address this issue because our decision does not turn on plaintiff's alleged disability.

[4] This is a reference to then Plainfield City Fire Chief Frank Tidwell.

patrol shift, not this present situation where plaintiff retired after the disciplinary charges. Later in his deposition, Director Riley testified that the phrase "look where he's at" was a reference to the fact that he had brought disciplinary charges against plaintiff, and plaintiff retired.

In November 2017, plaintiff filed a complaint against the City, the Plainfield PD, Mayor Mapp, and Director Riley. In March 2018, plaintiff filed a second amended complaint. He alleged defendants violated the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -50, by engaging in age discrimination and forcing him to retire. He also alleged defendants created a hostile work environment based on his "disability and/or perceived disability" forcing him into retirement. Plaintiff further asserted defendants are liable for "aiding and abetting" under the LAD.

In December 2019, defendants[5] moved for summary judgment. The trial court,[6] in essence, found plaintiff's claims were contractually barred due to the stipulation of settlement entered into between the parties. In September 2021, we reversed, holding plaintiff was not contractually barred from asserting LAD claims in this matter because the release was limited to claims "with respect to

---

[5] Director Riley is represented by separate counsel.

[6] A different judge granted these initial summary judgment motions.

the subject matter of [the] disciplinary action." See Reid v. City of Plainfield, No. A-2691-19 (App. Div. Sept. 14, 2021) (slip op. at 9). Because the trial court had not addressed the remaining LAD claims, we remanded for further proceedings. Id. at 10.

In November 2021, defendants again moved for summary judgment. On January 11, 2022, the trial court granted their motions for summary judgment and dismissed plaintiff's second amended complaint with prejudice. Plaintiff moved for reconsideration. On March 4, 2022, the court denied the motion for reconsideration.

II.

Plaintiff argues the trial court failed to appreciate that defendants' harassment was severe and pervasive. He contends the trial court failed to properly consider the harsh punishment sought as a result of the internal affairs investigation was a constructive discharge. Further, the court failed to appreciate the evidence that Director Riley actively and purposely discriminated against and harassed him thereby causing him to resign.[7]

---

[7] Plaintiff does not appeal from the trial court's order dismissing Counts I (LAD age discrimination) and II (LAD hostile work environment discrimination for disability and/or perceived disability) as to Director Riley. Therefore, the only count regarding Director Riley on appeal is Count III (aiding and abetting).

A-2426-21

In reviewing a summary judgment decision, we measure the motion court's findings and conclusions against the standards laid out in <u>Brill v. Guardian Life Insurance Co. of America</u>, 142 N.J. 520 (1995). <u>Great Atl. & Pac. Tea Co. v. Checchio</u>, 335 N.J. Super. 495, 498 (App. Div. 2000). Those standards are well-established: summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." <u>Brill</u>, 142 N.J. at 528-29 (quoting <u>R.</u> 4:46-2(c)). Issues of law are subject to the de novo standard of review, and the trial court's determination of such issues is accorded no deference. <u>Kaye v. Rosefielde</u>, 223 N.J. 218, 229 (2015).

"Motions for reconsideration are governed by <u>Rule</u> 4:49-2, which provides . . . the decision to grant or deny a motion for reconsideration rests within the sound discretion of the trial court." <u>Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment</u>, 440 N.J. Super. 378, 382 (App. Div. 2015). "Reconsideration should be used only where '1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious . . . the [c]ourt either did not consider, or failed to appreciate the

11

significance of probative, competent evidence.'" Ibid. (alterations in original) (quoting Capital Fin. Co. of Del. Valley v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008)). Therefore, an appellate court will not disturb a trial court's decision on a motion for reconsideration unless there is a clear abuse of discretion. Ibid.

The LAD provides, in relevant part:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a. For an employer, because of . . . age . . . [or] disability . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .
>
> [N.J.S.A. 10:5-12(a).]

To establish a prima facie case of age discrimination, "an employee must 'show that the prohibited consideration . . . played a role in the decision[-]making process and that it had a determinative influence on the outcome of that process.'" Bergen Com. Bank v. Sisler, 157 N.J. 188, 207 (1999) (quoting Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 344 (App. Div. 1997)).

To prove employment discrimination under the LAD, New Jersey courts have adopted the burden-shifting analytical framework established in

12

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and Viscik v. Fowler Equipment Co., 173 N.J. 1, 13-14 (2002).  Within the context of an age discrimination claim brought under the LAD, plaintiffs must show that:  1) they were members of a protected group; 2) their job performance met their "employer's legitimate expectations"; 3) they were terminated; and 4) the employer replaced or sought to replace them.  Nini v. Mercer Cnty. Cmty. Coll., 406 N.J. Super. 547, 554 (App. Div. 2009) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005)), aff'd, 202 N.J. 98 (2010).

In ruling on the summary judgment motion, the court determined Director Riley's conduct at the hospital did not rise to severe and pervasive so as to constitute a hostile work environment.  "And, [it] certainly, [did] not [rise to the level] of constructive discharge" because plaintiff did not contest the disciplinary action stemming from the blood warrant incident.

On reconsideration, as on appeal here, plaintiff argued the court did not appreciate or consider other occasions besides the hospital incident where he was asked about his age and retirement plans.  In ruling on the reconsideration motion, the court addressed plaintiff's severe and pervasive arguments under the hostile work environment claim and the constructive discharge allegation.  The court noted plaintiff failed to allege "anything that was severe or pervasive.

13

Under the circumstances of people asking him, . . . how old are you again?  When are you going to retire[?]  . . .  It just doesn't meet the . . . standard whatsoever."

The court explained it

> did not fail . . . to appreciate that the record reflects that plaintiff was subjected to these comments from co-workers that he should retire due to his age.  However, plaintiff asserts that adverse employment action, a required element of hostile work environment suffered by plaintiff was being forced to retire, which legally culminates to a constructive discharge.
>
> . . . [L]ooking at the record, reflecting the plaintiff over the course of the years was subjected to questions about retirement, and his age, and was visited in the hospital by [Director] Riley . . . failed to culminate into an adverse employment action pled by plaintiff, that is, constructive discharge.
>
> . . . [T]he alleged conduct under the totality of the circumstances doesn't vault that threshold of constructive discharge.  Further, plaintiff has not pled sufficient facts to suggest that the questions of . . . age and retirement . . . plaintiff was subjected to were not mere . . . offensive utterances and happened with such frequency or severity as to amount to an alteration of plaintiff's employment.
>
> As such, . . .  [the court] just can't find that [plaintiff] . . . makes out a cause of action on these facts for either hostile work environment or constructive discharge, and . . . for those reasons, and with respect, the [m]otion for [r]econsideration is denied.

A.

Plaintiff asserts the trial court ignored the evidence he produced showing that Director Riley threatened him while he was in his hospital bed, and that this act alone was enough to establish a genuine issue of material fact. He also argues the trial court failed to appreciate other evidence of defendants' alleged harassment. Specifically, that Director Riley and other superior officers began a campaign suggesting repeatedly, given his age and disability, plaintiff should retire. Plaintiff argues that when he failed to retire, Director Riley lodged two disciplinary actions against him for failing to supervise subordinates. He also notes that when his son protested in support of him, defendants harassed his son by calling the department where he was employed. Additionally, months after plaintiff retired, Director Riley admitted that he used the phrase "[plaintiff has] been Teflon for years but look where he's at" in reference to the fact that he brought disciplinary charges against plaintiff.

"Our review of a hostile work environment claim requires us to consider the totality of the circumstances." El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 178 (App. Div. 2005). To establish a hostile work environment claim under the LAD, a plaintiff must satisfy each prong of a four-part test. Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002). The plaintiff

15

must establish "the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." Ibid.

Under the severe and pervasive prong, "[i]t is the harasser's conduct, not . . . plaintiff's injury, that must be severe or pervasive." Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 610 (1993). Whether conduct is severe or pervasive is evaluated under the totality of the circumstances, assessing, "(1) 'the frequency of all the discriminatory conduct'; (2) 'its severity'; (3) 'whether it is physically threatening or humiliating, or a mere offensive utterance'; and (4) 'whether it unreasonably interferes with an employee's work performance.'" Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196 (2008) (quoting Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003)).

The inquiry is whether a reasonable person in a plaintiff's position would consider the alleged discriminatory conduct "to be sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment." El-Sioufi, 382 N.J. Super. at 178 (quoting Heitzman v. Monmouth Cnty., 321 N.J. Super. 133, 147 (App. Div. 1999)). The test is strictly objective. Godfrey, 196 N.J. at 197.

16

The trial court correctly found plaintiff did not establish a hostile work environment claim. Defendants' interactions with plaintiff fall short of threatening or humiliating conduct. We are unconvinced the trial court erred in failing to appreciate plaintiff's claims when it determined the allegations did not rise to the level of severe and pervasive for the purposes of a hostile work environment claim. Even viewing the facts in a light most favorable to plaintiff, Director Riley's conversation with plaintiff at the hospital and other "random" questions about plaintiff's retirement plans from other officers did not amount to severe and pervasive conduct as contemplated by our caselaw.

After admitting to certain misconduct, plaintiff was permitted to retire in good standing as part of a negotiated agreement. Notably, the charges leading to plaintiff's agreement to retire stemmed from the Prosecutor's Office's independent investigation. Also, the record shows the disciplinary charges regarding Sergeant Gwinn's computer use and the internal investigation regarding the blood warrant started before plaintiff went into the hospital. There is no indication that these disciplinary charges were brought because of plaintiff's protected status, as the charges reasonably related to plaintiff's misconduct. Moreover, Director Riley's comments to plaintiff at the hospital, against the backdrop of the Union County Prosecutor's recommendation that

17 <span>A-2426-21</span>

plaintiff be disciplined for the blood warrant incident, were neither "severe [n]or pervasive [so as] to alter the conditions of employment and create an intimidating, hostile, or offensive work environment." El-Sioufi, 382 N.J. Super. at 178.

## B.

Turning to the constructive discharge claim, plaintiff argues the discovery reveals defendants' "outrageously discriminatory conduct" created conditions "so intolerable" any reasonable person in plaintiff's position would have resigned. Specifically, plaintiff asserts Director Riley asked him on multiple occasions how old he was and when he was going to retire, and after doing so, Director Riley brought disciplinary charges against plaintiff in January 2016 for failing to supervise another officer who engaged in prohibited computer activity. Then, within two weeks of Director Riley bringing disciplinary charges against plaintiff, Lieutenant Venson asked plaintiff how old he was and suggested that he retire. Next, Director Riley and another officer visited plaintiff in the hospital and suggested he retire. According to plaintiff, Director Riley, in a "threatening" manner, asked plaintiff how old he was, when he was thinking about retiring, and stated that "if you were to go, this could all go away," referencing the disciplinary charges related to the blood warrant incident.

On February 24, 2016, shortly after this conversation at the hospital, Director Riley brought disciplinary charges regarding the blood warrant incident against plaintiff seeking to demote him to the rank of sergeant. Additionally, Lieutenant Tyler of the Plainfield PD testified that he alerted the Franklin Township Police Department of plaintiff's son's protest because it was a safety concern. Plaintiff alleges this was an attempt to harass plaintiff. He asserts this entire scheme forced him to retire—a constructive discharge—so that he would not suffer the financial consequences of a demotion.

A constructive discharge occurs when an employer engages in "'severe or pervasive' conduct . . . that is so intolerable . . . a reasonable person would be forced to resign rather than continue to endure it." Shepherd, 174 N.J. at 28 (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001)). "[T]he standard envisions a 'sense of outrageous, coercive and unconscionable requirements.'" Ibid. The heightened standard for proof of a constructive discharge claim recognizes an employee's "obligation to do what is necessary and reasonable in order to remain employed rather than" resign or retire. Ibid. (quoting Shepherd v. Hunterdon Developmental Ctr., 336 N.J. Super. 395, 420 (App. Div. 2001), rev'd on other grounds, 174 N.J. 1 (2002)). The proofs required to establish a constructive discharge are objective, i.e.,

19

whether a "reasonable person" would have resigned.  Ibid.  See also Muench v.

Twp. of Haddon, 255 N.J. Super. 288, 302 (App. Div. 1992).  An employee

claiming constructive discharge

> has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit.  A trial court should consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances.
>
> [Shepherd, 174 N.J. at 28 (quoting Shepherd, 336 N.J. Super. at 420).]

We are satisfied the trial court did not err in concluding plaintiff did not

suffer a constructive discharge.  Based on the record, we are unconvinced a

reasonable jury could find defendants' conduct was so unbearable that it would

have forced plaintiff into retirement.  Brill, 142 N.J. at 545.  With the advice of

counsel, plaintiff agreed to retire while acknowledging he did not engage in

proper supervision of his subordinates and failed to contact the Prosecutor's

Office or internal affairs regarding the inadequacy of the investigation and the

conduct of the officers under his command.  Plaintiff did not take advantage of

the ability to contest the charges in an administrative proceeding.  Measured by

the objective reasonable person standard, neither Director Riley's questions of

20

plaintiff while at the hospital nor the other referenced incidents when plaintiff was asked about retirement can be viewed as reaching the heightened level of "outrageous, coercive[, or] unconscionable" conduct. Shepherd, 174 N.J. at 28.

## C.

Lastly, plaintiff argues Director Riley's active and purposeful conduct aided and abetted the City's overall goal to force plaintiff to retire due to his age and disabilities. This conduct included: (1) suggesting plaintiff retire while in the hospital and more specifically asking plaintiff how old he was and stating "if you were to go, [the disciplinary charges] could all go away"; (2) authorizing disciplinary action against plaintiff regarding the blood warrant incident; and (3) commenting on the audio recording that plaintiff had "been Teflon for years but look where he's at."

N.J.S.A. 10:5-12 specifies that it is

> an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> . . . .
>
> (e) For any person, whether an employer or an employee or not, to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden under this act, or to attempt to do so.

Our Supreme Court has held that "individual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person'" under N.J.S.A. 10:5-12(e). Cicchetti v. Morris Cnty. Sheriff's Office, 194 N.J. 563, 594 (2008).[8] The Court has stressed the significance of supervisory positions,

> recogniz[ing] that "[a] supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace." "An employer [through its supervisors] has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs."
>
> [Id. at 592 (second and third alterations in original) (internal citations omitted) (quoting Taylor v. Metzger, 152 N.J. 490, 503-04 (1998)).]

The "aiding and abetting" analysis under N.J.S.A. 10:5-12(e) requires a finding of "active and purposeful conduct." Tarr v. Ciasulli, 181 N.J. 70, 83 (2004). To support this finding, a plaintiff must demonstrate that

> (1) the party whom the defendant aids . . . perform[ed] a wrongful act that cause[d] an injury; (2) the defendant must be generally aware of [their] role as part of an

---

[8] The parties dispute whether a defendant supervisor may aid and abet their "own conduct." Because we determine plaintiff has not demonstrated wrongful discrimination, we need not address this issue.

overall illegal or tortious activity at the time that [they] provide[] the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

[Id. at 84 (third alteration in original) (quoting Hurley v. Atl. City Police Dep't, 174 F.3d 95, 127 (3d Cir. 1999), cert. denied, 528 U.S. 1074 (2000)).]

Because we determined above, based on the same allegations, that the trial court did not err in granting summary judgment and finding defendants did not engage in any wrongful discrimination, plaintiff cannot satisfy the first Tarr factor. Therefore, we need not address the other aiding and abetting factors.

We discern no basis to disturb the trial court's conclusions. In short, the evidence in the record, even when viewed in the light most favorable to plaintiff, does not support a prima facie case for a hostile work environment, constructive discharge, or an aiding and abetting claim. Accordingly, we are satisfied the trial court properly granted summary judgment in defendants' favor and denied plaintiff's motion for reconsideration.

To the extent we have not specifically addressed any remaining arguments raised on appeal, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2426-21