JUSTICE SOLOMON delivered the opinion of the Court.
*256 **259 In this appeal, we are called upon to consider the relationship between two statutory schemes: the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, and the New Jersey Workers' Compensation Act (Act), N.J.S.A. 34:15-1 to -146. Specifically, we must determine whether a plaintiff who pursues a workers' compensation claim under the Act but fails to utilize its enforcement mechanisms may make a claim for failure to accommodate under the LAD. Relatedly, we must also consider whether medical treatment qualifies as a reasonable accommodation under the LAD.
We answer both inquiries in the negative and conclude that plaintiff Frank Caraballo cannot establish a prima facie failure-to-accommodate claim under the LAD. We therefore reverse the judgment of the Appellate Division and reinstate summary judgment in favor of the Jersey City Police Department (JCPD).
I.
The trial court record reveals the following. Plaintiff Frank Caraballo joined the JCPD as a police officer in February 1973 and became a detective in 1977. While on duty in August 1999, Caraballo sustained injuries to his hands, back, knees, and legs during a motor vehicle accident. The injuries to his knees were severe and became chronic. As a result of those injuries, Caraballo fluctuated between full duty, light duty, and paid sick leave throughout the remainder of his tenure on the police force.
In August 2001, Caraballo filed a workers' compensation claim related to the 1999 accident. He also underwent anterior cruciate ligament reconstruction surgery on his left knee.
Over the next several years, physicians evaluated Caraballo to determine whether he required bilateral knee replacement surgery. Two city-appointed doctors agreed that Caraballo would eventually need total knee replacements to recover fully from his **260 injuries; other doctors confirmed Caraballo's need for knee replacement surgery.
In 2006, Caraballo's workers' compensation attorney notified the JCPD's counsel that the city-appointed doctors had agreed that Caraballo was a candidate for knee replacement surgery. His attorney also requested that the JCPD's counsel "[k]indly have [R]isk [M]anagement authorize ... the surgery recommended" by both doctors. In 2008, Caraballo's attorney informed the JCPD's counsel that Caraballo wanted a particular doctor to perform the surgery and that the doctor had been approved by Risk Management.
In August 2010, Caraballo submitted an application for retirement to the New Jersey Division of Pensions and Benefits, with an effective retirement date of March 1, 2011. Around the same time, the Commander of the JCPD Medical Bureau, Lieutenant John McLellan, followed up with Caraballo and his medical providers. Based on his review of Caraballo's file, McLellan determined that Caraballo "had been unfit for duty for numerous years." Although doctors had recommended total knee replacement surgery, McLellan did not believe that Caraballo was pursuing this option. According to McLellan, Caraballo refused to see the doctor "who would *257 be able to determine unequivocally whether or not he could have the surgery."
In February 2011, Chief of Police Thomas Comey learned that Caraballo had not undergone knee replacement surgery. Chief Comey arranged a meeting with Caraballo to confirm whether he planned to retire on March 1. Chief Comey informed Caraballo that if he did not retire by that date, the JCPD would apply for an involuntary disability pension on his behalf.
Caraballo retired on March 1. Shortly thereafter, Risk Management authorized an orthopedic surgeon to evaluate Caraballo for bilateral knee replacement surgery. The surgeon examined Caraballo and, according to the doctor's records, Caraballo "was told to contact [the] office to pick a date for surgery pending medical and **261 cardiac clearance." Caraballo never called the doctor's office to schedule a date for surgery.
On March 4, 2013, more than six-and-a-half years after he requested that the JCPD authorize knee replacement surgery, Caraballo settled his workers' compensation claim. Shortly thereafter, he filed a complaint against the JCPD asserting a cause of action under the LAD.[1] Specifically, Caraballo alleged that the JCPD failed to authorize his knee replacement surgery and, therefore, failed to reasonably accommodate his disability.
After the close of discovery, the JCPD moved for summary judgment, arguing that Caraballo could not bring a failure-to-accommodate claim under the LAD because he was unable to perform the essential functions of his job even with an accommodation. In response, Caraballo maintained that he had established a prima facie failure-to-accommodate case under the LAD.
In an oral decision, the trial court granted the JCPD's motion for summary judgment. The trial court disagreed with Caraballo's contention "that the knee surgery itself qualifies as a reasonable accommodation" under the LAD. The court found that even if the knee surgery could have qualified as a reasonable accommodation, the record contained several medical evaluations showing that Caraballo was unable to carry out the responsibilities of a police officer with or without the surgery. According to the court, Caraballo could not bring a successful failure-to-accommodate claim because his handicap "would pose a hazard to himself, fellow officers, and the public."
The trial court also found that Caraballo could not bring a viable LAD claim because he failed to enforce his right to have knee surgery in the workers' compensation court. Citing **262 Flick v. PMA Insurance Co., 394 N.J. Super. 605, 928 A.2d 54 (App. Div. 2007), the court concluded that because Caraballo failed to make an application to enforce his right to have knee surgery, he was "precluded from using a denial of the [w]orkers' [c]ompensation benefits as a basis for his [ ]LAD claim."
On appeal, Caraballo argued that the trial court erred in granting the JCPD's summary judgment motion. According to Caraballo, the judge made "findings of fact on genuinely disputed issues" and "erroneous findings of fact that were not supported by the record." Caraballo also argued that the judge erred in his interpretation *258 and application of the LAD and failed to appreciate that knee surgery could qualify as a reasonable accommodation.
In response, the JCPD agreed with the trial court's determination that knee replacement surgery itself does not qualify as a reasonable accommodation under the LAD. It also agreed with the trial court's rationale that, regardless of whether knee surgery qualifies as a reasonable accommodation, Caraballo failed to set forth a prima facie case because he was not qualified to perform the essential functions of his job, with or without the surgery. Finally, according to the JCPD, Caraballo's failure to pursue a claim for benefits in his workers' compensation case -- and his subsequent decision to settle that case -- could not serve as the basis for a failure-to-accommodate claim under the LAD. The JCPD relied primarily on Stancil v. ACE USA, 211 N.J. 276, 48 A.3d 991 (2012), for the proposition that the Act provides the exclusive remedy for an injured worker to pursue a claim for benefits.
The Appellate Division reversed. According to the panel, the trial judge erred in granting summary judgment because the record contained numerous material factual disputes -- including why Caraballo retired without receiving knee surgery -- that should have been presented to a jury. Relying on this Court's decision in Victor v. State, 203 N.J. 383, 4 A.3d 126 (2010), the Appellate Division also concluded that Caraballo established a prima facie failure-to-accommodate case under the LAD. The **263 panel reasoned that although Caraballo may not have been able to perform his job without a reasonable accommodation, there was a material dispute as to whether he would have been able to perform his job with the accommodation -- total knee replacement surgery.
The JCPD filed a petition for certification, which we granted. 233 N.J. 485, 186 A.3d 899 (2018). We also granted amicus curiae status to the New Jersey Association for Justice (NJAJ) and to the New Jersey Municipal Excess Liability Joint Insurance Fund, the New Jersey State League of Municipalities, and the New Jersey Institute of Local Government Attorneys (collectively, Municipal Amici).
II.
The parties' arguments here mirror those raised in the Appellate Division. In addition, the JCPD argues that the Appellate Division erred when it failed to address either the Act or Caraballo's failure to utilize any of the Act's enforcement mechanisms in addressing the LAD failure-to-accommodate claim.
The Municipal Amici agree with the JCPD's arguments and also highlight that Caraballo's LAD claim is "inexorably intertwined" with his workers' compensation claim. According to the Municipal Amici, an employee who fails to avail himself of the Act's exclusive remedies should not be permitted to benefit from his own neglect in seeking treatment in a failure-to-accommodate claim under the LAD. Those amici also urge this Court to conclude that medical treatment cannot qualify as a reasonable accommodation under the LAD. They argue that Caraballo's position, if accepted, would allow employees to "leverage the threat of a LAD suit against an employer" if a demand for workers' compensation benefits is denied.
According to Caraballo and the NJAJ, the Appellate Division properly reversed the trial court's grant of summary judgment in favor of the JCPD because disputed issues of material fact exist. Additionally, Caraballo claims that the Act is not implicated in this **264 matter because the JCPD terminated his employment in response *259 to his disability "without first allowing him the reasonable accommodation of knee surgery."
III.
An appellate court reviews a summary judgment decision by the same standard that governs the motion judge's determination. RSI Bank v. Providence Mut. Fire. Ins. Co., 234 N.J. 459, 472, 191 A.3d 629 (2018) (citing Bhagat v. Bhagat, 217 N.J. 22, 38, 84 A.3d 583 (2014) ). Under that standard, summary judgment is appropriate when, viewed in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Ibid. (quoting R. 4:46-2(c)); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995).
IV.
To determine whether the grant of summary judgment was appropriate here, we begin with the JCPD's exhaustion-of-remedies argument.
The Workers' Compensation Act reflects "a historic trade-off whereby employees relinquish[ ] their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffer[ ] injuries by accident arising out of and in the course of employment." Stancil, 211 N.J. at 285, 48 A.3d 991 (quoting Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 174, 501 A.2d 505 (1985) ). In essence, by virtue of accepting guaranteed benefits under the Act, "the employee agrees to forsake a tort action against the employer." Ramos v. Browning Ferris Indus., Inc., 103 N.J. 177, 183, 510 A.2d 1152 (1986) (citing **265 Morris v. Hermann Forwarding Co., 18 N.J. 195, 197-98, 113 A.2d 513 (1955) ). Therefore, subject to certain statutory exceptions, the Act provides the exclusive remedy for an employee who sustains a work-related injury to obtain relief from his employer. See Van Dunk v. Reckson Assocs. Realty Corp., 210 N.J. 449, 459, 45 A.3d 965 (2012) ("The Act's exclusivity can be overcome if the case satisfies the statutory exception for an intentional wrong."); see also Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602, 611, 790 A.2d 884 (2002) (referring to N.J.S.A. 34:15-8 as "the so-called exclusive remedy provision").
The Act, however, did not provide for a panoply of enforcement mechanisms until 2008, after the Appellate Division's decision in Flick. In that case, the plaintiff initiated a lawsuit in the Law Division because his employer failed "to comply in a timely manner with orders issued by the compensation judge authorizing certain medical procedures." 394 N.J. Super. at 608, 928 A.2d 54. The Appellate Division concluded that employees must "first pursue all avenues for relief" in the workers' compensation court before seeking enforcement in the Law Division. Id. at 613, 928 A.2d 54. Because the plaintiff "failed to exhaust administrative remedies available to him before the judge of compensation," the Appellate Division affirmed dismissal of the complaint. Id. at 608, 928 A.2d 54. In doing so, however, the Flick panel acknowledged the "plaintiff's contentions of systemic failure" and commented that "any prospective reform of [the Act's] enforcement measures that may be needed" should come from the Legislature or the Division of Workers' Compensation. Id. at 614, 928 A.2d 54.
*260 In the wake of Flick, the Legislature enacted N.J.S.A. 34:15-28.2, which "created a variety of enforcement mechanisms" for employees "to combat failure to comply with an order." Stancil, 211 N.J. at 290-91, 48 A.3d 991. Specifically, N.J.S.A. 34:15-28.2 empowers a compensation judge to respond to noncompliance by (a) imposing costs, interest, and legal fees; (b) imposing fines and penalties; (c) "[c]los[ing] proofs, dismiss[ing] a claim or suppress[ing] a defense"; (d) "[e]xclud[ing] evidence or witnesses"; (e) holding a contempt hearing after which a finding of contempt can **266 be enforced in Superior Court; and (f) "[t]ak[ing] other actions deemed appropriate by the judge of compensation with respect to the claim."
We explored the enforcement tools made available under N.J.S.A. 34:15-28.2 in Stancil, in which the injured plaintiff's employer failed repeatedly to abide by the workers' compensation court's orders. 211 N.J. at 279-81, 48 A.3d 991. Recognizing that the Legislature "granted courts of compensation a contempt remedy" enforceable in the Superior Court, id. at 290, 48 A.3d 991, we declined the plaintiff's invitation to "creat[e] a new cause of action" against an employer's compensation carrier directly, id. at 291, 48 A.3d 991. In reaching that conclusion, this Court explained that a finding to the contrary would "authoriz[e] an avenue for relief that would both conflict with and significantly undermine the system chosen by our Legislature." Id. at 277-78, 48 A.3d 991. In short, under the Act, an employee must exhaust administrative remedies available in the workers' compensation court before seeking enforcement in the Law Division. See Flick, 394 N.J. Super. at 613, 928 A.2d 54.
Here, Caraballo filed his workers' compensation claim in 2001, retired in 2011, and settled his claim with the JCPD in 2013. In the interim, Caraballo contacted Risk Management several times to obtain authorization for double knee replacement surgery but never sought to enforce his right to the surgery in the workers' compensation court. Caraballo's failure to utilize the Act's administrative remedies to obtain knee replacement surgery precludes his failure-to-accommodate claim under the LAD.
V.
Although Caraballo's failure to exhaust the administrative remedies available to him resolves the matter, we nevertheless consider the question of first impression posed by this case to offer guidance on a matter of considerable public importance: whether the alleged failure to provide an employee with knee surgery can **267 serve as the basis for a viable failure-to-accommodate claim. We begin with consideration of failure-to-accommodate claims under the LAD and its federal counterpart, the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213.
A.
"The LAD is remedial social legislation whose overarching goal is to eradicate the 'cancer of discrimination.' " Nini v. Mercer Cty. Cmty. Coll., 202 N.J. 98, 108-09, 995 A.2d 1094 (2010) (quoting Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652 (1988) ). To eliminate workplace discrimination against those with disabilities, "[b]oth the LAD and ADA were enacted to protect the rights of those with disabilities, and to enable them to vindicate those rights in court." Royster v. State Police, 227 N.J. 482, 500, 152 A.3d 900 (2017). "[A]s social remedial legislation," the LAD and the ADA are both "deserving of a liberal construction."
*261 Bergen Commercial Bank v. Sisler, 157 N.J. 188, 216, 723 A.2d 944 (1999).
Unlike its federal counterpart, "the LAD statute does not specifically address failure to accommodate." Royster, 227 N.J. at 499, 152 A.3d 900. However, "our courts have uniformly held that the [LAD] nevertheless requires an employer to reasonably accommodate an employee's handicap." Ibid. (alteration in original) (quoting Potente v. County of Hudson, 187 N.J. 103, 110, 900 A.2d 787 (2006) ); accord N.J.A.C. 13:13-2.5 (codifying employers' duty to reasonably accommodate persons with disabilities in the workplace). Therefore, we "evaluate[ ] an employer's obligation to reasonably accommodate an employee's disability under the LAD in accordance with the ADA." Grande v. St. Clare's Health Sys., 230 N.J. 1, 21, 164 A.3d 1030 (2017) (citing Royster, 227 N.J. at 499, 152 A.3d 900 ).
To establish a prima facie failure-to-accommodate case, a plaintiff must demonstrate that he or she:
**268 (1) "qualifies as an individual with a disability, or [ ] is perceived as having a disability, as that has been defined by statute"; (2) "is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations"; and (3) that [the employer] "failed to reasonably accommodate [his or her] disabilities."
[ Royster, 227 N.J. at 500, 152 A.3d 900 (first and third alterations in original) (quoting Victor, 203 N.J. at 410, 421, 4 A.3d 126 ).]
Although those elements are not identical to those of the ADA, they capture the spirit of and implicate the same proofs as the ADA. See ibid.
N.J.A.C. 13:13-2.5(b)(1) provides some specific examples of reasonable accommodations under the LAD:
(i) Making facilities used by employees readily accessible and usable by people with disabilities;
(ii) Job restructuring, part-time or modified work schedules or leaves of absence;
(iii) Acquisition or modification of equipment or devices; and
(iv) Job reassignment and other similar actions.
Those accommodations "are all designed to make certain changes in the work environment or structuring of employees' time that will allow disabled employees to remain at work without their physical handicaps impeding their job performance." Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 426-27, 772 A.2d 34 (App. Div. 2001). Indeed, our courts have interpreted "reasonable accommodation" to "refer[ ] to the duty of an employer to attempt to accommodate the physical disability of the employee, not to a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits or remuneration." Raspa v. Office of Sheriff of Gloucester, 191 N.J. 323, 339, 924 A.2d 435 (2007) (quoting Jones, 339 N.J. Super. at 426, 772 A.2d 34 ).
B.
As to whether medical treatment qualifies as a reasonable accommodation under the LAD, our courts have yet to address this question. However, federal courts have explored this issue under the ADA. Just as the ADA has guided our failure-to-accommodate jurisprudence under the LAD, it informs our analysis of this issue.
**269 The ADA defines "reasonable accommodation" to include "job restructuring, *262 part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). Regulations promulgated by the United States Equal Employment Opportunity Commission (EEOC) further define "reasonable accommodation" to include "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Like New Jersey's regulations, those promulgated by the EEOC "make clear that ... a 'reasonable accommodation' is generally 'any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.' " Desmond v. Yale-New Haven Hosp., Inc., 738 F.Supp.2d 331, 350 (D. Conn. 2010) (quoting 29 C.F.R. app. § 1630.2(o) ).
The United States District Court for the District of Connecticut has addressed whether medical treatment can qualify as a reasonable accommodation under the ADA. In Desmond, the plaintiff served as a physician's assistant at Yale-New Haven Hospital (the hospital) and suffered a workplace injury to both of her hands. Id. at 336. The plaintiff filed a workers' compensation claim with the hospital and asserted that in order to continue working she would need medical treatment, including pain management and physical therapy. Id. at 339. After the hospital terminated the plaintiff's employment, she asserted that the hospital had an obligation under the ADA "to provide her with reasonable and necessary medical treatment that would have [enabled] her to perform her job." Id. at 347.
**270 The court disagreed, concluding that neither the text of the ADA nor its regulations "contemplate that an employer should be required to provide a disabled employee with medical treatment in order to restore her ability to perform essential job functions." Id. at 350. The court concluded that the medical treatment sought by the plaintiff "d[id] not propose or reference any change in the work environment or involve the removal of workplace barriers, and therefore [was] not a reasonable accommodation." Id. at 351. In reaching that conclusion, the court relied upon the EEOC's compliance manual, which states that "an employer has no responsibility to monitor an employee's medical treatment or ensure that s/he is receiving appropriate treatment because such treatment does not involve modifying workplace barriers." Id. at 350 (quoting EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Compliance Manual § 92, No. 915.002 (Oct. 17, 2002), https://www.eeoc.gov/policy/docs/accommodation.html).[2] We find persuasive the district court's reasoning, which hews closely to the language of the regulations and the EEOC manual.
This Court has similarly interpreted the term "reasonable accommodation" in a manner consistent with New Jersey's regulations -- regulations that closely mirror those promulgated by the EEOC. Like the district court, we impose a duty on the employer to modify the work environment and remove workplace barriers in an "attempt *263 to accommodate the physical disability of the employee," but we do not require the employer "to acquiesce to the disabled employee's requests for certain benefits or remuneration." Raspa, 191 N.J. at 339, 924 A.2d 435 (quoting Jones, 339 N.J. Super. at 426, 772 A.2d 34 ). In this regard, the balance struck by the district court in Desmond fits neatly within this Court's LAD jurisprudence. **271 The medical procedure sought by Caraballo -- his double knee replacement surgery -- is neither a modification to the work environment nor a removal of workplace barriers. Rather, it is a means to treat or mitigate the effects of his injuries, like the treatments at issue in Desmond. We therefore find it consistent with the LAD, the ADA, and their regulations that Caraballo's total knee replacement surgery cannot qualify as a reasonable accommodation under the LAD.
VI.
For the reasons set forth above, the judgment of the Appellate Division is reversed, and the trial court's order granting summary judgment in favor of the JCPD is reinstated.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA join in JUSTICE SOLOMON'S opinion. JUSTICE TIMPONE did not participate.

In addition, Caraballo asserted a cause of action under the New Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-1 to -2. His claims under the LAD and the CRA were originally asserted against both the JCPD and Chief Comey. However, Caraballo eventually withdrew his CRA claim against both the JCPD and Chief Comey, as well as his LAD claim against Chief Comey in his individual capacity.

Although the ADA Amendments Act of 2008 became effective January 1, 2009, the 2002 EEOC Enforcement Guidance remained unchanged.