**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3257-22

CHRISTOPHER BOHNYAK,

    Plaintiff-Appellant,

v.

TOWN OF WESTFIELD, JAMES
GILDEA, and GREG O'NEIL,

    Defendants-Respondents.

_____

Argued April 16, 2024 – Decided May 6, 2024

Before Judges Rose, Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-2878-20.

Thomas Henry Andrykovitz argued the cause for appellant.

Richard A. Grodeck argued the cause for respondents Town of Westfield, James Gildea, and Greg O'Neil (Piro Zinna Cifelli Paris & Genitempo, LLC, attorneys; Richard A. Grodeck, of counsel; Kristen Jones, on the brief).

PER CURIAM

Plaintiff Christopher Bohnyak appeals from a May 12, 2023 Law Division order denying reconsideration of the March 23, 2023 order, which granted summary judgment to defendants the Town of Westfield, James Gildea, and Greg O'Neil dismissing with prejudice Bohnyak's claims under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, and the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. We affirm.

I.

Bohnyak alleges that during the COVID-19 pandemic, defendants discriminated against him based on his cardiac disability. He specifically maintains defendants refused to provide reasonable accommodations, including medical-grade personal protective equipment (PPE), to clean Westfield's public park restrooms. Further, he alleges he was suspended and terminated in retaliation for "blowing the whistle" on defendants' unlawful discrimination.

Bohnyak began employment with Westfield's Department of Public Works (DPW) in February 2015. In 2017, he was diagnosed with a cardiac condition. O'Neil, the DPW Superintendent, supervised Bohnyak and all DPW employees. Gildea, Westfield's Town Administrator, managed operations and human resource matters. Pursuant to Westfield's Personnel Policy manual,

2

Gildea was responsible for investigating and responding to employees' requests for a reasonable accommodation.

Westfield and Local Union N. 496 were parties to a collective bargaining agreement (CBA). The agreement outlined the grievance process for employees' complaints and governed discipline, stating: "The Town will not discharge, discipline or suspend any employee without just cause." Further, it required arbitration of unsettled grievances.

In April 2020, early in the COVID-19 pandemic, Bohnyak self-isolated, taking personal days. After returning to work in May, he was assigned to clean litter. Bohnyak provided the DPW a doctor's note sometime between mid-May and early June. The complete note, dated April 20, stated:

> Chris Bohnyak is my patient. He has a cardiac condition and if he cannot adequately perform social distancing during his work and receive adequate [PPE,] he must be isolated at home.
>
> If further information is needed, please do not hesitate to call.

[(Emphasis added).]

On May 27, 2020, Westfield's mayor announced that on June 1, three park restrooms would "reopen with an enhanced cleaning and sanitizing schedule." The DPW had the responsibility to clean the restrooms twice daily. Richard

3

Eubanks, Bohnyak's direct supervisor, selected Bohnyak for the restroom assignment, reasoning "with his previous experience . . . he would be a perfect person." Prior to the COVID-19 pandemic, Bohnyak had occasionally cleaned the restrooms.

On May 28, 2020, Eubanks informed Bohnyak of his restroom reassignment. Bohnyak expressed concerns, reminding Eubanks of his cardiac condition, but cleaned the restrooms. The DPW provided Bohnyak with disinfectants and available PPE, including a cloth mask, rubber gloves, and goggles. He was permitted to clean in isolation with the door open. Bohnyak advised Eubanks he was not comfortable and required medical-grade PPE. He stated, "if I have to do this, I would like . . . an N95 mask" and "a Tyvek suit."[1] Eubanks referred the request to O'Neil as medical-grade PPE was unavailable. O'Neil explained to Bohnyak that under State guidelines, the provided masks and gloves were appropriate. The next day, Bohnyak relayed to O'Neil he was still "not comfortable" "because of [his] heart." He requested an N95 mask, Tyvek suit, and face shield be provided each time he cleaned a restroom, amounting to thirty masks and suits per week. Bohnyak's union representative,

---

[1] Tyvek suits "prevent[] hazardous materials . . . from passing through the material." What is Tyvkek, Dupont, https://www.dupont.com/what-is-tyvek.html (last visited Apr. 30, 2024).

Michael Broderick, requested O'Neil "get somebody with less seniority, without a heart condition, to do the job."

On June 1, 2020, Bohnyak returned to work, refusing the assignment without medical-grade PPE. Eubanks contacted O'Neil to discuss Bohnyak's request and the DPW's inability to provide the PPE. After O'Neil advised, "We don't have to offer you that," Bohnyak again refused the assignment, and O'Neil issued a one-day suspension without pay. O'Neil sent a memorandum to Gildea, advising Bohnyak was "suspended for refusing to clean the municipal lavatories," which Gildea approved.

The same morning, Bohnyak emailed Gildea, O'Neil, and Westfield's mayor to "memorialize [his] suspension from work" and request accommodations, stating in part:

> I am currently under a doctor[']s care for which I provided DPW Supt. Greg O'Neil with doctor's notes describing my medical condition. . . .
>
> I am not refusing to work[,] however, the work for which I have been recently assigned, cleaning park bathrooms, exacerbates my underlying medical condition with regards to the C[OVID]-19 virus and it puts me at greater risk.

A-3257-22

Bohnyak also filed a union grievance claiming he was "put in unsafe work conditions" despite "provid[ing] a d[octo]r['s] note to management," and was "scared for [his] life."

After receiving the email, O'Neil and Gildea discussed Bohnyak's work assignment and refusal. O'Neil informed Gildea that due to Bohnyak's previous issues with employees and supervisors in other DPW divisions, another assignment was unavailable; and based on the doctor's note, the restroom assignment was appropriate.

On June 2, 2020, Bohnyak returned to work, continuing his refusal without medical-grade PPE. O'Neil issued a three-day suspension. On June 5, O'Neil suspended Bohnyak indefinitely for continuing to refuse the assignment. O'Neil sent Gildea a memorandum, stating: "The above referenced employee has been suspended indefinitely due to refusal to clean the public lavatories." Gildea approved the suspension.

On July 7, 2020, Westfield conducted a meeting concerning Bohnyak's grievance, which Broderick attended. Bohnyak surreptitiously recorded the meeting. He was asked if he would return to work if one N95 mask with filters could be obtained, but he made clear that he required the medical-grade PPE "[d]octors and nurses [we]re getting." After the meeting, Gildea issued a

memorandum summarizing that "the parties discussed the safety of the assignment." He noted Bohnyak received "the same PPE provided to all other DPW employees," which complied with the doctor's note and the Center for Disease Control and Prevention guidelines. Further, Gildea memorialized Bohnyak's request for "two sets of medical-grade PPE . . . including an N95 mask, a face shield, gloves, and surgical gowns," was "unreasonable" because such PPE was "reserved for first responders."

Westfield's Police Chief, Christopher Battiloro, corroborated Gildea's PPE assertions, testifying the police department was "appropriately equipped," but did "not have an abundance" of PPE. Similarly, Broderick acknowledged towns "could not get N95 masks" or "the suits" because "they were not available." Broderick further conceded Bohnyak's request for medical-grade PPE was unattainable "because everything was geared to either [emergency medical services] responders, the police and/or . . . hospital[s]."

On August 26, Bohnyak received Westfield's letter advising his failure to return to work by September 4 would result in termination. On September 4, Bohnyak returned with a second doctor's note stating he had "an elevated risk of complications if he were to contract COVID[-]19" and requesting "adequate [PPE]." Bohnyak again refused the restroom assignment and was suspended.

Thereafter, Gildea provided Bohnyak a termination letter, stating because Bohnyak continued to refuse the assignment with the "requisite" PPE, his employment was terminated, effective immediately. The same day, Bohnyak filed a seven-count complaint alleging LAD and CEPA violations against Westfield and O'Neil.

On November 16, the parties attended a CBA grievance arbitration hearing. The arbitrator found Westfield had just cause to suspend Bohnyak. The arbitrator found he failed to establish "a factual, objective or lawful basis for [his] refusal to perform an appropriate work assignment" and the April 20 doctor's note "d[id] not require the [PPE]" Bohnyak requested.

On May 18, 2022, Bohnyak filed an eight-count amended complaint adding Gildea as a defendant. The complaint averred defendants committed disability discrimination in violation of the LAD by: failing to accommodate, declining to engage in an interactive process, and retaliating against him. He further alleged CEPA violations, arguing he suffered adverse employment actions after reporting defendants' discrimination.

On July 29, after the close of discovery, defendants moved for summary judgment. Following oral argument, the motion judge issued an order and accompanying statement of reasons granting summary judgment and dismissing

the amended complaint with prejudice. In denying Bohnyak's motion for reconsideration, the judge acknowledged he incorrectly found the arbitration decision estopped Bohnyak from raising certain claims, but separately determined Bohnyak failed to demonstrate defendants violated the LAD. He found, "[d]efendants did not fail to reasonably accommodate []or engage in the interactive process in good faith." Regarding the retaliation claim, the judge found there was no causal connection between the June 1 email and any adverse consequence because "the protected activity . . . occurred after the alleged retaliation." Further, the judge found the CEPA claim failed because no material fact demonstrated a "causal connection between the protected activities and his suspensions and termination." Regarding reconsideration, the judge found Bohnyak failed to demonstrate the decision was "palpably incorrect."

On appeal, Bohnyak argues material issues of fact exist and the judge erroneously dismissed: the LAD claims for failure to provide reasonable accommodation, failure to engage in an interactive process, and retaliation; and the CEPA count.

II.

We review a trial court's summary judgment decision "de novo and apply the same legal standard" under Rule 4:46-2(c). See Crisitello v. St. Theresa

A-3257-22

Sch., 255 N.J. 200, 218 (2023). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). A court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Liberty Surplus Ins. Corp. v. Nowell Amorso, P.A., 189 N.J. 436, 445-46 (2007)). "A dispute of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Gayles by Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 22 (App. Div. 2021) (quoting Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017)).

We review orders denying reconsideration for abuse of discretion. Granata v. Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016). A court abuses its discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible

basis.'" Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 400 N.J. Super. 378, 382 (App. Div. 2015) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

## A.  LAD

The LAD's remedial "purpose is 'nothing less than the eradication "of the cancer of discrimination."'" C.V. ex rel. C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 306-07 (2023) (quoting Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600 (1993)).  It prohibits unlawful employment practices and discrimination "based on race, religion, sex, or other protected status[] that creates a hostile work environment." Cutler v. Dorn, 196 N.J. 419, 430 (2008); see also N.J.S.A. 10:5-12(a).  "There is no single prima facie case that applies to all discrimination claims.  Instead, the elements of the prima facie claim vary depending upon the particular cause of action." Victor v. State, 203 N.J. 383, 408 (2010).

The LAD expressly "does not prevent adverse employment treatment premised upon the employee's, or prospective employee's, conduct." Barbera v. Di Martino, 305 N.J. Super. 617, 633 (App. Div. 1997).  "Put another way, the LAD acknowledges the authority of employers to manage their own businesses." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 446 (2005).  "The LAD

was and is intended as a shield to protect employees from the wrongful acts of their employers, and not as a sword to be wielded by a savvy employee against his employer." Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 373 (2007).

i. Failure to Accommodate and Engage in the Interactive Process

"Although the LAD statute does not specifically address failure to accommodate, 'our courts have uniformly held that the [LAD] nevertheless requires an employer to reasonably accommodate an employee's handicap.'" Royster v. N.J. State Police, 227 N.J. 482, 499 (2017) (alternation in original) (quoting Potente v. County of Hudson, 187 N.J. 103, 110 (2006)). Our Supreme Court has recognized "the obligation of employers to reasonably accommodate an employee with a disability." Richter v. Oakland Bd. of Educ., 246 N.J. 507, 530 (2021) (citing N.J.A.C. 13:13-2.5(b)).

To establish an LAD claim for failure to accommodate:

> a plaintiff must demonstrate he or she (1) "qualifies as an individual with a disability, or [ ] is perceived as having a disability, as that has been defined by statute"; (2) "is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations"; and (3) that defendant "failed to reasonably accommodate [his or her] disabilities."
>
> [Royster, 227 N.J. at 500 (alternations in original) (quoting Victor, 203 N.J. at 410).]

N.J.A.C. 13:13-2.5 "codif[ies] [an] employers' duty to reasonably accommodate persons with disabilities in the workplace." Caraballo v. City of Jersey City Police Dep't, 237 N.J. 255, 267 (2019). Specifically, N.J.A.C. 13:13-2.5(b) provides "[a]n employer must make a reasonable accommodation to the limitations of an employee . . . who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship." Reasonable accommodations include "making facilities . . . readily accessible"; restructuring jobs, such as providing "part-time or modified work schedules or leaves of absence"; the "[a]cquisition or modification of equipment or devices"; and "[j]ob reassignment[s]." N.J.A.C. 13:13-2.5(b)(1). Employers are to "consider the possibility of reasonable accommodation before firing, demoting or refusing to hire or promote a person with a disability on the grounds that his or her disability precludes job performance." N.J.A.C. 13:13-2.5(b)(2).

The LAD does not require employers to provide an accommodation that would pose an undue burden. Richter, 246 N.J. at 524. Under N.J.A.C. 13:13-2.5(b)(3), the factors determining whether an accommodation presents an undue hardship on the employer include: "[t]he overall size of the employer's business with . . . the number of employees"; "type of the employer's operations . . .

workforce"; "nature and cost of the accommodation needed"; and "[t]he extent to which accommodation would involve waiver of an essential requirement of a job." Further, in determining the type of reasonable accommodation required, an "employer must initiate an informal interactive process with the employee. This process must identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability." Tyan v. Vicinage 13 of Superior Ct. of N.J., 351 N.J. Super. 385, 400 (App. Div. 2002) (citation omitted) (citing 29 C.F.R. § 1630.2(o)(3)). "[A]n employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want reasonable accommodation.'" Ibid. (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)). After a request for an accommodation is "made, 'both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.'" Ibid. (quoting Taylor, 184 F.3d at 312).

An employer fails to engage in the interactive process if: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations . . . ; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations"; and (4) but for "the employer's lack of good faith," it could have "reasonably accommodated" the employee. Id. at

14

400-01. An employer is lawfully permitted, pursuant to N.J.A.C. 13:13-2.8(a), "to take any action otherwise prohibited . . . where it can reasonably be determined that an applicant or employee, as a result of the individual's disability, cannot perform the essential functions of the job even with reasonable accommodation."

We begin by acknowledging that Bohnyak's cardiac condition unquestionably constituted a disability under the LAD. Therefore, defendants were required to provide a reasonable accommodation and engage in an interactive process in good faith.

Bohnyak contends the judge erroneously granted summary judgment because material facts existed demonstrating defendants violated the LAD by failing to: accommodate his disability by providing his requested medical-grade PPE or reassignment; and engage in an interactive process. We disagree. Eubanks selected Bohnyak for the restroom assignment knowing he had previously performed the job, had a disability, and would be provided available PPE. Bohnyak only requested the accommodation of medical-grade PPE and an alternative position after he was reassigned to the restrooms. In support of the accommodation, Bohnyak submitted a three-sentence doctor's note, dated weeks earlier, stating his cardiac condition required "social distancing . . . and

15

A-3257-22

adequate" PPE. By allowing Bohnyak to clean the restrooms in isolation, defendants accommodated Bohnyak's social distancing request.

Notably, Bohnyak has not posited a material fact disputing the DPW's available PPE was not "adequate PPE" for the assignment and his disability. Bohnyak provided no medical documentation defining "adequate" PPE and the doctor's notes did not specify medical-grade PPE was necessary. No facts in the record demonstrate medical-grade PPE was available to anyone other than first responders. Further, O'Neil's deposition testimony that no alternative DPW division assignments were available because of Bohnyak's prior issues with supervisors and staff was unrefuted. Mere statements that a factual dispute exists are insufficient to defeat summary judgment. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995) (finding insubstantial arguments based on assumptions or speculation are not enough to overcome summary judgment).

We concur with the judge's finding that Bohnyak demonstrated no material facts to dispute defendants acted in good faith by engaging in discussions regarding his requested medical-grade PPE and advising that the thirty N95 masks and Tyvek suits per week were unavailable. As required by N.J.A.C. 13:13-2.5(b)(1), defendants considered the "[a]cquisition or modification of equipment" to accommodate Bohnyak's request. Bohnyak's

16

argument the DPW should have sought PPE from Westfield's first responders is unavailing. As acknowledged by Bohnyak's union representative, N95 masks and Tyvek suits were "definitely not available." While DPW workers unquestionably contributed during the COVID-19 pandemic, they were not considered first responders and therefore were not provided medical-grade PPE. Bohnyak's newly raised assertion that surgical masks were not provided is also unavailing as he unequivocally "refuse[d] the job" without "N95 masks, [a] Tyvek suit, and a face shield each time [he] cleaned a bathroom."

An employer considering a reasonable accommodation need not "acquiesce to the disabled employee's requests for certain benefits." Victor, 203 N.J. at 423 (quoting Raspa v. Off. of Sheriff of Gloucester, 191 N.J. 323, 339 (2007)). The LAD only requires an employer undertake reasonable accommodation "designed to make certain changes in the work environment or structuring of employees' time that will allow disabled employees to remain at work without their physical handicaps impeding their job performance." Caraballo, 237 N.J. at 268 (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 426-27 (App. Div. 2001)).

We also reject Bohnyak's argument that a jury had to consider: if his requests were reasonable; if the provided PPE was "adequate"; and what the

doctor intended by "adequate PPE." While an expert is generally unnecessary to support an LAD claim when a disability is established, we have "h[e]ld that where the extent of a[n] LAD claimant's disability is relevant to the reasonableness of the accommodations offered or demanded, the claimant must establish it by expert medical evidence." Wojtkowiak v. N.J. Motor Vehicle Comm'n, 439 N.J. Super. 1, 7 (App. Div. 2015).

Additionally, our Supreme Court has held "a plaintiff's disability can be effectively addressed by [a treating physician's] testimony limited to the plaintiff's diagnosis and treatment." Delvecchio v. Township of Bridgewater, 224 N.J. 559, 580 (2016). Bohnyak has failed to proffer any medical evidence regarding the necessity for medical-grade PPE and other necessary accommodations. Therefore, we discern no reason to disturb the judge's determination that Bohnyak failed to demonstrate a factual dispute regarding the reasonableness of Bohnyak's requests and defendants' accommodation.

We only briefly comment on Bohnyak's argument that because defendants "made no effort to contact" his doctor, a failure to accommodate was established. Bohnyak has not cited, nor has our research revealed, any authority supporting an independent obligation to contact his doctor to "clarif[y] . . . what 'adequate' meant." While defendants were required to and did engage in an interactive

process, they had no obligation to unilaterally contact his doctor to ascertain his medical needs.

We next consider Bohnyak's argument defendants failed to engage in an interactive process. The record demonstrates defendants sufficiently engaged with Bohnyak through multiple interactions after he requested accommodations and provided the first doctor's note. Defendants discussed the possibility of other placements, conducted an in-person grievance meeting, and provided Bohnyak three months to return to work by September 4 or be terminated. Bohnyak returned in September, refused the assignment, and provided a second doctor's note again requesting "adequate" PPE without further explanation, which resulted in termination. Bohnyak had a reciprocal obligation to act in good faith. See Tyan, 351 N.J. Super. at 400. We discern no reason to disturb the judge's decision granting summary judgment on Bohnyak's LAD claims for failure to provide a reasonable accommodation and engage in the interactive process.

## ii. Retaliation

We also are satisfied Bohnyak failed to demonstrate a prima facie case of retaliation under the LAD. The judge found "the undisputed facts demonstrate [Bohnyak] was not suspended and terminated due specifically to his June 1,

2020 email, but because he refused to perform his assigned task, and with all inferences drawn to [Bohnyak] there is no showing same was simply pretext." We agree.

To establish an LAD claim for retaliation, a plaintiff must show:  "(1) [he] was in a protected class; (2) [he] engaged in [a] protected activity known to the employer; (3) [he] was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence."  Victor, 203 N.J. at 409.  If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for the employment decision.  See Tisby v. Camden Cnty. Corr. Facility, 448 N.J. Super. 241, 248 (App. Div. 2017).  If the defendant does so, the burden shifts back, and the plaintiff must then prove the employer's proffered explanation is merely a pretext for discrimination.  Ibid.

It is uncontroverted Bohnyak's first suspension for refusing the restroom assignment occurred before he sent the protected email.  The record supports the judge's conclusion that each adverse employment action thereafter occurred because Bohnyak continuously refused the assignment without thirty N95 masks and Tyvek suits weekly.  As we have already stated, prior to the COVID-19

pandemic, Bohnyak had been assigned to the clean the restrooms. It was only upon Bohnyak's reassignment to the restrooms that he provided a medical note requesting the accommodation of "adequate PPE" and social distancing. While engaging in an interactive process, defendants consistently maintained Bohnyak's refusal would result in adverse employment actions. Contrary to Bohnyak's assertions, the record yields insufficient facts supporting a causal link between his email alleging disability discrimination and defendants' employment actions taken. See Young v. Hobart West Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) ("Where the timing is not 'unusually suggestive,' the plaintiff must set forth other evidence to establish the causal link.").

We conclude Bohnyak failed to materially dispute that defendants engaged in non-discriminatory, progressive disciplinary measures, which were in response to his continued refusal to complete his assignment. See Nardello v. Township of Voorhees, 377 N.J. Super. 428, 434 (App. Div. 2005) ("[N]ot every employment action that makes an employee unhappy constitutes 'an actionable adverse action.'" (quoting Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 378 (Law Div. 2002))). We discern no reason to disturb the judge's determination that summary judgment was warranted on the LAD retaliation claim.

## B. CEPA

We also reject Bohnyak's CEPA arguments that sufficient facts were established to show: a causal connection between his protected email and subsequent suspensions and termination; and the adverse employment actions were pretext, rather than repercussions for his continuous refusal "to perform the duties of [his] position."

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Allen v. Cape May Cnty., 246 N.J. 275, 289 (2021) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003)). CEPA prohibits employers from retaliating against employees who perform a whistleblowing activity. N.J.S.A. 34:19-3.

To establish a prima facie CEPA claim, a plaintiff must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action.

A-3257-22

> [Allen, 246 N.J. at 290 (quoting Dzwonar, 177 N.J. at 462).]

At issue is whether Bohnyak satisfied a prima facie showing under the fourth CEPA element. To satisfy the fourth CEPA element, a plaintiff must demonstrate "a causal connection . . . between the whistle-blowing activity and the adverse employment action." Dzwonar, 177 N.J. at 462. A causal connection "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action." Maimone v. City of Atl. City, 188 N.J. 221, 237 (2006). "The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection." Ibid. Once a plaintiff establishes a prima facie case that the employer took an adverse employment action, "the burden of persuasion is shifted to the employer to rebut the presumption of discrimination by articulating some legitimate nondiscriminatory reason for the adverse employment action." Allen, 246 N.J. at 290-91 (quoting Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999)). Once an employer proffers a legitimate reason, "plaintiff has the ultimate burden of proving that the employer's proffered reasons were a pretext for the discriminatory action taken by the employer." Id. at 291 (quoting Kolb, 320 N.J. Super. at 478).

Bohnyak argues a causal connection between his protected activity and defendants' adverse employment actions is established by the temporal proximity connecting his email and his second assignment refusal suspension. The record belies this contention. As we similarly observed, and need not repeat, in discussing Bohnyak's retaliation claim, Bohnyak's first suspension for refusing to perform the assignment was before his protected email and after he was notified his requested medical-grade PPE was unavailable. "[A]ccepting all [Bohnyak's] allegations as true," the judge correctly found he "did not demonstrate [a] causal connection between the protected activities and his suspensions and retaliations." Mere assertions of a causal connection are insufficient to overcome summary judgment. See Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 533 (App. Div. 2019) ("'[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome' a motion for summary judgment." (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005))).

Bohnyak next argues defendants' proffered reason for their adverse employment actions—his suspension and termination for refusing to perform an essential job function while provided the available "requisite PPE" and social distancing—was pretext for disability discrimination. We observe Bohnyak's email acknowledged he was "memorializ[ing] [his] suspension from work," for

refusing to clean the restrooms and he continuously refused to perform the assignment. Bohnyak has failed to sufficiently refute that no other assignments were available because of his prior issues with DPW supervisors and staff. We observe it is Bohnyak's burden to demonstrate defendants' proffered reason was a pretext. Accepting all reasonable inferences in favor of Bohnyak, the record amply supports the judge's conclusion that he failed to factually dispute defendants' nondiscriminatory reason for the adverse employment actions was not in violation of CEPA. Thus, summary judgment on his CEPA claim was appropriate.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-3257-22